### Ernest SMITH and Jimmy Rudd, Plaintiffs,

v.

**Larry NORRIS, Former Acting Director and Current Director of the Arkansas Department of Correction; Willis H. Sargent, Former Warden of the Cummins Unit of the Arkansas Department of Correction; Major A.J. Hall, Chief of Security; Lieutenant R.R. Wood, Shift**

Supervisor; J. Cleveland, Guard; John Hood, Officer; James Banks, Classification and Assignment Officer; and Dale Reed, Warden, Cummins Unit of the Arkansas Department of Correction, Defendants.

No. PB–C–93–731.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Feb. 23, 1995.

Paul J. James, Sherman, James & Yeatman, Hugh E. Crisp, Little Rock, AR, for plaintiffs.

Kyle Ray Wilson, Atty. General's Office, Little Rock, AR, for defendants.

## *MEMORANDUM OPINION*

EISELE, District Judge.

### *INTRODUCTION*

The evidentiary hearing which was conducted from February 13, 1995, until February 17, 1995, was first considered because of some unresolved factual issues which arose in connection with the parties' various motions for summary judgment. However, in light of the scheduled trial of Mr. Rudd's cause of action for declaratory and injunctive relief and the defendants' claims of qualified immunity, the Court decided to hear and resolve all of the pending non-jury issues at one time. The results discussed in detail below, are as follows:

1. The Court holds for Mr. Rudd upon his claim for declaratory and injunctive relief.

2. The Court denies the defendants' claims of qualified immunity.

3. The Court grants Mr. Smith's motion for partial summary judgment on the liability issues in connection with his claims for damages for personal injuries, leaving only the damages issues to be tried to a jury at a later date.

### *MR. RUDD'S CLAIM FOR EQUITABLE RELIEF*

The Court will first deal with Mr. Rudd's complaint seeking declaratory injunctive relief.

There is, of course, no doubt that "the conditions under which [prisoners are] confined are subject to scrutiny under the [Cruel and Unusual Punishments Clause of the] Eighth Amendment." [1] *Helling v. McKinney*, 509 U.S. ——, ——, 113 S.Ct. 2475, 2408, 125 L.Ed.2d 22 (1993). Thus, it is axiomatic that if the State of Arkansas wishes to incarcerate persons convicted of violating its criminal laws, it must do so under conditions that meet basic constitution-

---

1. The Eighth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

al standards. In its recent opinion in *Farmer v. Brennan*, — U.S. —, — — —, 114 S.Ct. 1970, 1976–77, 128 L.Ed.2d 811 (1994), the Supreme Court removed any doubt (if indeed there ever was any) from the proposition that, under the Constitution, " '[p]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.' " (citation omitted); *see also Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991) (describing "the protection an inmate is afforded against other inmates" as a "condition of confinement" subject to the Eighth Amendment). The Court's statement in *Farmer* was not, however, a new development in the law, but rather an exposition of the state of the law that had been uniformly recognized by the lower courts, including the Court of Appeals for the Eighth Circuit. *See, e.g., Falls v. Nesbitt*, 966 F.2d 375, 377 (8th Cir. 1992); *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984). While the State is not required to insure that its prisoners face absolutely no danger from assaults by other inmates, it must "take reasonable measures to guarantee the safety of [its] inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).

As both this case and the prior history of the *Finney* case [2] make clear, it is not easy to state with precision exactly what measures must be taken to insure that the State's inmates are provided with the level of personal security to which they are entitled under the Constitution. The Supreme Court has provided limited guidance in this area, stating only that prison conditions are to be evaluated under "evolving standards of decency," and that, while "in the end [a court's] own judgment will be brought to bear on the acceptability" of a prison's conditions, this judgment "should be informed by objective factors to the maximum extent possible." *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981). This is precisely what the Court attempted to do

throughout the history of the *Finney* litigation, which, as the parties know, involved a comprehensive review of the Arkansas prison system. In its final decision in *Finney,* the Court required the Arkansas Department of Correction ("ADC") to, among other things, implement certain safeguards in the open barracks of the Cummins Unit which at that time, the Court believed would be adequate to insure that prisoners who were incarcerated therein would receive the protection from inmate-on-inmate assaults to which they are constitutionally entitled. *Finney v. Mabry, supra,* 546 F.Supp. at 639–40. Although the Court believes that there can be no serious debate on this issue, the Court stresses that the limitations on the operation of the open barracks imposed by *Finney,* which have been discussed at length by the parties and which will be further discussed *infra,* were intended to represent the absolute minimum measures which the ADC had to put in place in order to comply with the constraints imposed by the Eighth Amendment. *Id.* at 640. As the facts of this case have clearly demonstrated, however, the Court was incorrect in concluding that the limitations imposed by *Finney* would be adequate to satisfy the Constitution's mandate that inmates housed in the open barracks of the Cummins Unit receive reasonable protection from assaults by other inmates. Whether this error resulted from a mistake in the Court's prior judgment, a subsequent change in the daily living conditions in the Cummins Unit, or both, the Court has no doubt that, given the present conditions, the Constitution requires that additional measures be taken if the defendants wish to continue to house inmates in these open barracks.

■ So, even if the Court were to find that the defendants are presently in compliance with *Finney*—which it does not (see discussion *infra* )—the Court would nevertheless have to conclude that Mr. Rudd, as a resident of the open barracks in the Cummins Unit,[3] is entitled to declaratory and injunc-

---

**2.** See *Finney v. Mabry,* 546 F.Supp. 628 (E.D.Ark.1982); *Finney v. Mabry,* 534 F.Supp. 1026 (E.D.Ark.1982).

**3.** There has been some testimony indicating that, although Mr. Rudd was a resident of one of the

open barracks when his claim for injunctive relief was filed, he has since been transferred out of the Cummins Unit. Nevertheless, since this transfer was effectuated subsequent to Mr. Rudd's complaint, he continues to have the requisite standing to pursue his claim for injunctive

tive relief, as the *Finney* requirements are demonstratively inadequate to provide for his reasonable protection from assaults by other inmates as required by the Eighth Amendment.

■ The United States Supreme Court has recently addressed the issue presently faced by the Court, namely a prison inmate's claim for injunctive relief based upon a penal institution's unconstitutional conditions of confinement. After concluding that such relief may be awarded only if prison officials have, from a subjective point of view, demonstrated "deliberate indifference" to the inmate's constitutional rights, *Farmer v. Brennan, supra,* —— U.S. at —— – ——, 114 S.Ct. at 1979–82, the Court went on to further elaborate upon the showing that must be made to warrant injunctive relief:

'[O]ne does not have to await the consummation of threatened injury to obtain injunctive relief. . . . In a suit . . . [that] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison officials' current attitudes and conduct[ ]'': their attitudes and conduct at the time the suit is brought and persisting thereafter. An inmate seeking an injunction on the ground that there is 'a contemporary violation of a nature likely to continue[ ]'' . . . must come forward with evidence from which it can be inferred that the defendants-officials were at the time the suit was filed, and are at the time of . . . judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally, to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the liti-

gation and [its likely continuation] into the future.

*Id.* at ——, 114 S.Ct. at 1983 (citations omitted). The Court concludes that Mr. Rudd has met this standard.

The record developed in this case clearly demonstrates that the defendants were fully on notice (*i.e.,* had actual knowledge) of the dangers faced by inmates in the open barracks, and yet they failed (and have continued to fail) to take many of the steps that are obviously required to alleviate those dangers. While defendants have, subsequent to this litigation, adopted a Hobby Craft Policy to remedy the dangers presented by the ADC's prior policy,[4] they have done nothing to alleviate the dangers posed by their past, and current, staff assignment policy with respect to the open barracks in the Cummins Unit. This amounts to deliberate indifference on their parts to the constitutional rights of Mr. Rudd and others housed in those open barracks.[5] *See Farmer v. Brennan, supra,* —— U.S. at —— – —— & nn. 8–9, 114 S.Ct. at 1981–83 & nn. 8–9. Moreover, since the evidence established in this case indicates that the defendants have no plans to discontinue their current staffing practices in the Cummins Unit, the Court also concludes that Mr. Rudd is entitled to injunctive relief under the standards announced in *Farmer v. Brennan.* See discussion of the evidence below.

The Court, while believing itself compelled to make these findings, also believes it is necessary to put the defendants' actions and decisions in perspective. Immense progress has been made by the ADC since the close of the *Finney* case. Further, staffing plans currently under consideration, while not targeted at the situation presented by the open barracks, suggest further success in moving

relief. Defendants cannot avoid the Court's review of the conditions of the Cummins Unit (or any of its penal institutions) simply by transferring inmates who have sought to litigate the issue. *See Bell v. Wolfish,* 441 U.S. 520, 526 n. 5, 99 S.Ct. 1861, 1867 n. 5, 60 L.Ed.2d 447 (1979).

4. Given this fact, Mr. Rudd is not entitled to injunctive relief on the issue of the adequacy of the ADC's Hobby Craft Policy. *Farmer v. Bren-*

*nan, supra,* —— U.S. at —— & n. 9, 114 S.Ct. at 1983 & n. 9.

5. The Court was impressed with the candor of ex-Director Lockhart's comment, after first acknowledging his awareness of the problem, that he "prayed nothing would happen because we did not have enough people." But, of course, the ADC did have "enough people" to take care of the very risks at issue in this litigation.

the ADC, overall, to higher and higher levels of professionalism.

As the Court views this case, and as has been stated above, the pertinent constitutional standard has not changed since the Court's decision in *Finney v. Mabry*. However, our awareness of the dangers presented by the open barracks, informed by studies and actual experience since *Finney*, has changed, as have the actual conditions in the Cummins Unit.

The problem of overcrowding and staffing as it relates to the safety of inmates in the open barracks was one of the issues that had to be dealt with in *Finney*. There was much argument as to just what staffing and procedures would be needed to meet constitutional standards in this area. The respondent state authorities were called upon in that case to submit a plan which they believed would adequately protect the safety of the inmates in these open barracks. The following language from the Court's final opinion in *Finney* sets forth the Court's understanding of the respondents' proposal for dealing with this problem:

> Finally, in addition to the officers that are always present in the hallways for visual surveillance of each barracks, a patrol officer enters the barracks on a random basis, inspecting each one at least once an hour at irregular times. This officer actually walks through the barracks checking activity among the inmates as well as locks, lights, latrines and the temperature.

546 F.Supp. at 640. The Court concluded that these measures, "if continued as represented to the Court," would be sufficient to provide adequate safety and inmate security in the open barracks. The Court then concluded:

> If the respondents continue the security measures as represented to the Court, they will be in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the issue of inmate safety and overcrowding in the open barracks.

*Id.*

Mr. Rudd argues first that the *Finney* requirements are not being followed by the defendants at the present time. He further argues that, even if the defendants were following the *Finney* requirements to the letter, experience since 1982 has demonstrated that those requirements, although well-intentioned by all when adopted, have not, and will not, provide the degree of protection and safety for the inmates housed in Barracks 5, 6 and 8 which is required by the Constitution. The Court, after hearing all of the evidence, agrees.

The Court will first explain why, at the present time, 1995, the requirements of *Finney* are not adequate to protect the Eighth Amendment rights of inmates housed in the open barracks. It will later, in connection with its assessment of the defendants' claim of qualified immunity, analyze the evidence in order to determine if the defendants were in compliance with the requirements of *Finney* on August 10, 1992, (the date of the assault on Mr. Smith), or any time thereafter.

As noted by the Court at the conclusion of the trial of this matter, the inadequacy of the *Finney* requirements to provide any reasonable degree of protection for the inmates in the open barracks was dramatically illustrated and demonstrated by the facts surrounding the assaults on Mr. Smith and Mr. Stewart by Mr. Lewis. *Finney* required regular and, on the average, hourly, security checks. Although the Court has found that the defendants did not comply with this minimal requirement, see discussion *infra*, it noted from the evidence that an officer made a "count" inside Barracks # 8 only ten minutes before the assaults which resulted in severe injuries to Mr. Smith and the death of Mr. Stewart. These "walk throughs," whether for "counts" or simple security, only take a few minutes. For the remaining fifty-five minutes or so in that hour, no officer would be *inside* the barracks.

Apparently, everyone agrees that having two officers stationed inside the open barracks would dramatically cut down on all sorts of criminal activity: assaults, homosexual rapes, drug and alcohol use, theft, etc. And the evidence makes it clear to the Court that there is a substantial incidence of such criminal activity at night in the open barracks, some reported, but most not. Just as

clearly, the addition of two officers inside these barracks would immensely lower the stress levels of the inmates.

The defendants have been forcefully confronted, at least since 1986, with the contention that they have not been adequately protecting the inmates in the open barracks from assaults. It is important to review this history.

The parties have brought the Court's attention to the "Phase I" and "Phase II" reports of the Arthur Young Company dated July, 1986 and September, 1986 respectively. At pages 36–37 of the former report, we find the following:

We find two problems associated with this situation:

1. The total absence of correctional officers in a barracks containing 100 inmates is contrary to the most fundamental security and safety practices. Inmates require constant supervision to preclude all types of inappropriate actions *and the almost total lack of direct monitoring could be resulting in the criminal activities currently being charged.* In our opinion, considering the number of inmates in each barracks and the open dormitory style environment, we would recommend at least two correctional officers be stationed within each of the barracks whenever the majority of the inmates are present. This is in addition to the corridor officer. During work time, the barracks officer complement could be reduced to one or none depending on the number of inmates "laying in."

(Emphasis added).

The Court also quotes from the cover letter to the September report as follows:

Our observations related to staffing, and documented in the Phase I Report, were correct. There is a critical and dangerous shortage of correctional officers when considering the size of the inmate population, the complexity of some of the institutions, the geographical area of the coverage, and the range of classifications of inmates.

And the Court notes the following excerpts from the body of that report:

*Finding:*

After review of the correctional officer staffing at all major institutions, we found what we consider to be inadequate numbers of personnel that, in our opinion, result in critical posts being undermanned or not manned.

\* \* \* \* \* \*

Analysis of the current post assignments in terms of the number of inmates requiring supervision, indicates that there is a disturbing shortage of correctional officers. The magnitude of the shortage, in our opinion, is such that the capability of the existing staff to control a major incident must be considered suspect.

\* \* \* \* \* \*

In conjunction with all of the above, we also recommend the addition of a number of correctional officer positions. In all areas where we are recommending additional officers, except Barracks 13/15, there currently are no officers posted; a situation that we consider extremely dangerous. Housing units of 100 inmates with no direct supervision cannot be thought to be under control. We therefore recommend the following:

\* \* \* \* \* \*

Barracks 5 through 12—inmates housed in these units are classified predominantly medium security. Presently, in each 100 bed unit, there are no correctional officer post assignments. The only supervision or surveillance comes from the officer in the main corridor manning the riot gate. Earlier in this section we recommended the modification of each of the 100 bed barracks into 50 bed barracks. If this is implemented, then we recommend that one correctional officer be assigned within each 50 bed unit, with appropriate personal alarm equipment. If the suggested facility modifications are not made, then we recommend that two correctional officer posts be established within each 100 bed barracks. *It is our opinion that the current post arrangements are dangerously inadequate and that more direct supervision is required.* In either post assignment concept, a raised platform should be installed

to provide a distinct officer station and allow better viewing of the entire barracks area. (Emphasis in original.)

Exhibit 10 from that report shows the total number of additional positions recommended for the Cummins Unit to be ninety-two. Additionally, the Court notes that the Arthur Young Study was commissioned by the Arkansas General Assembly.

The parties have also provided the Court with a study prepared by the United States Department of Justice. Two of those reports were made by Mr. Eugene Miller, who testified in this case. His first report is dated May 2, 1988. I quote from Mr. Miller's summary at Page 16 of this report:

> The Cummins Unit has made substantial progress since the time that it came under intense scrutiny by the Federal Courts. Yet, a number of problems of varying degrees of seriousness persist. The institution's dormitory housing units (the majority of its housing) are overcrowded. This situation poses substantial risks to personal safety from assaults and other untoward behavior as well as to environmental health. The overcrowding problem is exacerbated and compounded by a very noticeable need for additional correctional officers. At the present time, there are insufficient officers to make regular rounds inside the dormitories, particularly on the evening and night shifts. An additional 92 officers have been recommended.

The Court also notes the letter from Mr. James B. Turner, Acting Assistant Attorney General, Civil Rights Division, United States Department of Justice, addressed to then Governor Bill Clinton and dated August 2, 1989. That letter notified the Governor that the Department of Justice was commencing an investigation of the conditions of confinement in the Cummins Unit. It also advised the Governor of certain of the Department's findings. I quote from Page 3 of that report dealing with "Supervision, Staffing and Security":

> There is inadequate supervision of Cummins Unit inmates to ensure that their safety is protected. Not only are there too few correctional officers to properly supervise the 1,850 inmates, but officers on duty are not stationed in sufficient proximity to inmates to be able to prevent and intercede in inmate-on-inmate violence.
>
> Correctional officer coverage of the dormitory units is dangerously low, posing great risks of serious harm to persons confined there. At present, one officer stands out in the main circulation corridor to "supervise" two crowded dormitories (one on each side of the corridor). *Aside from the count, officers do not regularly make rounds inside the dormitories.* Given current staffing levels, officers are unable to make frequent patrols inside the dormitories which is essential to ensure security.
>
> Security is seriously compromised by the prison's understaffing. Our consultant reviewed and concurs with the findings of the staffing study that was conducted by the Arthur Young consulting firm. The study estimated that a minimum of 92 additional security guards are needed to insure safety at the prison.

(Emphasis added).

The evidence reflects that an agreement was reached between the State and the Justice Department that the latter would not bring suit challenging the State's prison conditions if the State complied with, and implemented, the Department's recommendation for additional staff. On February 28, 1991, then Governor Clinton wrote to the co-chairmen of the Joint Budget Committee of the Arkansas General Assembly requesting, *inter alia,* an amendment to Senate Bill 540 (the appropriations bill for the ADC) to add "92 (ninety-two) positions at the Cummins Unit at a cost of $1,536,278 for FY92 and $1,886,148 for FY93." The letter goes on:

> Pursuant to a U.S. Department of Justice investigation and recommendation as well as findings outlined in the Arthur Young Study, these positions are necessary to meet correctional standards and adequately secure areas not presently being covered.

Mr. Miller also made another report at the request of the Civil Rights Division of the United States Department of Justice in July, 1991. I quote the pertinent provisions of that report:

The primary housing modality for general population inmates at Cummins is a series of large, open dormitories. At night, when the lighting in the dorms is lowered significantly to facilitate sleeping, there is virtually no way to know what is happening in the back of the dorms, *without patrolling them frequently. Unfortunately, Cummins has not had sufficient staff to conduct such security supervision, relying on a single officer in the wide main corridor to supervise one large dorm on either side from a podium-type desk. As a result, officers rarely patrol inside the dormitories, which results in inadequate supervisors to ensure inmate safety.*

In reviewing reports of violent incidents for the past year, a number of rapes occurred in these dorms, that went totally undetected by staff until the victim subsequently reported the attack. Since rapes are almost always accompanied by threats of retaliation, if the victim tells staff, one wonders how many rapes occurred that were *not* reported—the victim preferring to find safety *via* some other mechanism within the inmate culture. On both of DOJ's trips to Cummins, a number of inmates have told me about their knowledge and fear of rapes in dormitories, which almost always happen in the back of the unit at night. In addition to rapes, other types of assaults are also likely to transpire in the rear of these dormitories. *Hence, primarily to resolve this demonstrable threat to inmate safety as well as several other security staffing needs, in 1988, I had recommended that an additional ninety-two (92) security officer positions be added to the staffing complement at Cummins.*

On this visit, it was gratifying to learn that the State has authorized these ninety-two positions. In fact, on June 27, 1991, the final authorization was received by the Department from the Board of Correction as the last step in Arkansas' complex legislative/executive budgetary allocation process. At a meeting on June 28, 1991, in the Cummins' main conference room attended by counsel for the State of Arkansas and the U.S. Department of Justice, Director Lockhart agreed that the ninety-two posi-

tions would be filled quickly by phases. In the first phase, thirty-two (32) new officers would be brought on board immediately, with an additional thirty (30) and thirty-two (32) to be hired at subsequent junctures *within the calendar year. He also agreed that the new positions would be used for the following priorities in descending order.*

1. *Two officers will be posted inside each of the large dormitories along the prison's main corridor on the night shift. Since Cummins' staff work twelve hour shifts and the vast majority of dorm inmates work outside in the fields during the day, this arrangements provides acceptable dormitory coverage.*

\* \* \* \* \* \*

If, after meeting the afore-mentioned priorities, there are any additional positions left over, they may be used for other security duties for which adequate staffing had not been provided previously.

To summarize, the State of Arkansas has addressed fully previous concerns about personal safety in the dormitories and issues of inadequate security staffing related thereto.

(Emphasis added).

Almost a year later, on May 26, 1992, Mr. Sargent wrote a memorandum to Mr. Norris concerning Mr. Miller's report of July 2, 1991. The section on "Security Staffing" reads as follows:

It was recommended that an additional ninety-two (92) security positions (9 C.O. Sergeants and 83 Correctional Officer I) be allocated for the Cummins Unit. These positions would be used in areas outlined in Mr. Miller's report and in a priority manner. On August 20, 1991, I submitted a report to your office outlining where these positions would be placed and in what priority (see attachment # 1). I have also attached, for your information and convenience, a list outlining where the sixty-two (62) positions are located as of April 22, 1992 (see attachment # 2). The final 30 Correctional Officer positions have not been filled due to an unexpected budget cut in October 1991. This reduction

amounted to over 3.5 million dollars. In April 1992 an additional 1.8 million was cut from the Department's budget. Due to these drastic cuts we were unable to hire the last 30 Correctional Officers. However, we have been able to maintain the initial sixty-two (62) officers recommended by the Justice Department.

This budget cut was a statewide measure and certainly affected more than the Department of Correction. We have felt a very positive effect from the additional staff that we have put on board. It is the Department's intention to make the additional 30 Correctional Officers a top priority after needed funds become available. When additional 30 positions are filled they will be placed in the remaining priorities as outlined in (see attachment # 1).

Mr. Sargent attached to his memorandum a copy of his August 22, 1991, report to Mr. Norris "outlining where these positions would be placed and in what priority." This shows the four new positions for each of the open barracks (5, 6, 7, and 8). And this report also sets priorities (01 to 10) for the use of the ninety-two additional personnel. The open barracks were placed in "Priority 03." Only twenty of the ninety-two slots had a higher priority than the open barracks, thus, the only reasonable assumption is that the next sixteen hired after the first twenty would be assigned to the open barracks. Attachment II to Mr. Sargent's May 26, 1992, memorandum is a "list outlining where the sixty-two (62) positions *are located as of April 22, 1992.*" (Emphasis added). That attachment shows that of the sixty-two positions three were "vacant" (one sargent and two correctional officer I's (COIs), and two COIs were "in training.") This left fifty-seven positions. The attachment shows the assignment of the forty-nine COIs and eight sergeants, and indicates that all of the first four priorities (01 through 04) were filled. Specifically, priority 03 shows all sixteen COIs being located in Barracks 5, 6, 7 and 8 as of April 22, 1992. *The problem is: the evidence in this case plainly shows that, in fact, no officers have ever been assigned and stationed inside these open barracks, as contemplated, at any time prior to the end of the trial on February 17, 1995.*

The ADC and the State of Arkansas avoided what would have inevitably been costly and time consuming litigation with the Department of Justice by agreeing to implement these staffing changes. But, four years later (and eight years after the Arthur Young report), there are still no officers stationed inside the open barracks.

Part of the defense in this case centered upon establishing that the defendants used good professional judgment in assigning the newly-hired personnel, whose positions were funded by the appropriations for the ninety-two positions recommended by the Department of Justice. They argue that it was their professional judgment that personnel vacancies, absenteeism, etc., in other areas of the prison resulted in more serious security concerns than those relating to the inmates housed in the open barracks. But how can this be when we know the defendants themselves rated and established the priorities for the use of these ninety-two additional positions, see Mr. Sargent's memorandum to Mr. Norris, and then completely disregarded and ignored those priorities. Clearly, the defendants diverted resources programmed to meet the minimum constitutional needs of the inmates housed in the open barracks. And just as clearly defendants did not consider whether the "more serious concerns" identified by the defendants at trial had a higher priority than staffing in the open barracks, or whether such concerns threatened their ability to operate the Cummins Unit within the constraints of the Constitution. Under the evidence, therefore, the Court views the defendants' asserted justification for not assigning and stationing officers inside the open barracks as, at best, a feeble *post-hoc* rationalization.

■ The Court agrees with the defendants that the opinions of experts do not establish constitutional standards—this is plainly a question of law for the Court—but those opinions can assist a court in assessing whether measures, such as staffing and security procedures, are adequate to reasonably assure compliance with constitutional standards. And here we have the unusual situation where the defendants and the State of

Arkansas agreed that a serious problem existed (which continues to exist), when they agreed on how to solve that problem, and where funds were actually appropriated to alleviate the problem. The defendants have simply not carried through on their agreement with the Department of Justice, instead making a unilateral decision to ignore the problem and use the funding elsewhere.

Accordingly, the Court concludes that the plaintiff, Mr. Rudd, has met the high standards for injunctive relief established by *Farmer v. Brennan.* The problems we deal with here have existed for years. The defendants have recognized the problems, they have agreed as to an appropriate solution, but still, at this late date, nothing has been done to implement that agreement.

## THE DEFENDANTS' CLAIMS OF QUALIFIED IMMUNITY

The hearing, which ended Friday, February 17, 1995, also dealt with the defendants' claims of qualified immunity in connection with Mr. Smith's cause of action under 42 U.S.C.A. § 1983 (West 1994). Since the Court has determined that defendants are not entitled to qualified immunity in connection with Mr. Smith's claim for damages based on the defendants' Hobby Craft Policy, see discussion *infra,* this discussion will be limited to defendants' claim of qualified immunity in connection with Mr. Smith's cause of action based upon inadequate staffing at the Cummins Unit.

Mr. Smith was brutally stabbed in the neck and the arm by inmate Lewis as he slept in his bed in Barracks # 8 around 2:15 a.m. on the morning of August 10, 1992. Mr. Smith's bunk was near the front of the large dormitory room. Mr. Lewis' bunk was near the rear of that room, a considerable distance away. Mr. Lewis had stabbed one or two other inmates in another incident that occurred at the Tucker Unit back in 1984, and was serving a sentence of life without parole for a murder he committed by stabbing the victim.[6] He used a razor-sharp hobby craft knife in both his attack on Mr. Smith and his immediately following attack on Mr. Stewart, which resulted in Mr. Stewart's death. Mr. Lewis was not authorized to have the hobby craft knife, but other inmates within Barracks # 8 were so authorized as part of the ADC's Hobby Craft Programs then in effect. It is assumed that Mr. Lewis either was given the knife or that he stole it.[7]

Mr. Lewis' inmate record for the year prior to this incident reveals that he was almost constantly in trouble. Disciplinaries kept him in "Class IV" status most of the time during the year preceding the August 10, 1992, attack on Mr. Smith. However, in February, 1992, he moved up to "Class III." On April 29, 1992, he attained "Class II" and was moved to the less secure open Barracks # 8, where he was given the job of barber. Mr. Smith was the barber for the black inmates and Mr. Lewis was to be the barber for the white inmates. On July 8, 1992, Mr. Lewis was moved up to "Class I". The stabbing attack occurred a month later.

The open barracks are considered "medium security" areas. More dangerous and difficult inmates are usually housed on the East End of the Cummins Unit. At the time of this assault, there were eighty-six men housed in Barracks # 8, seventy in "Class I," ten in "Class II," two in "Class III" and four in "Class IV" (two of which were "PMDs", *i.e.,* permanently medically disabled).

Mr. Smith claims that the conditions in Barracks # 8 on the night and early morning hours of August 9–10, 1992, which were known to the defendants, created an excessive risk of danger to him and that the

---

**6.** Mr. Lewis' inmate "Admission Summary," see Plaintiffs' Exhibit 33, gives the "Inmates' Version" of the crime as follows:

On or about March 13, 1983 subject states he can remember arguing with his grandmother and subject states he was high on drugs, quaaludes, and marijuana. Subject states he stole a three wheeler and rode it home. Subject states later that night he went into the home of Mary Lee Hunter and victim returned while he was there. Subject states he raped her and

then continued to go threw [sic] her things looking for and then found some money and then subject stated he killed her by stabbing her with a knife.

**7.** Neither defendants nor the record suggest any alternative explanation as to how Mr. Lewis came into possession of this knife. Mr. Sargent's notes on the incident, see Plaintiffs' Exhibit 20, states: "Knife came from Hobby Craft."

defendants were deliberately indifferent to his right to be free from an unreasonable and excessive risk of physical assaults by his fellow inmates.

The defendants have made much of their claims that there were relatively few incidents of physical assault reported for Barracks # 8. Approximately eight incidents per year involving physical violence have been reported for Barracks # 8 from 1992 until the present date. But, as the Court has noted earlier, a great many of such incidents go unreported. This is clear from the testimony of the inmates and the ADC officers. As stated by inmate Maxwell, it was "not my job" to report such incidents. When such incidents are reported, this may lead directly to retaliatory action against the person thought to be the "snitch." That may, indeed, have been part of the reason for Mr. Lewis' attack on Mr. Smith.

Mr. Smith filed formal grievances concerning homosexual activity and other actions by his fellow inmates in Barracks # 8, and he orally complained about Mr. Lewis' activities and his failure to do his share of the barber work. One cannot say on this record exactly what provoked Mr. Lewis to viciously attack Messrs. Smith and Stewart on August 10, 1992, but one can say that there is a strong disincentive to report crimes and rule violations on the part of one's fellow inmates because of the fear that these complaints will become known within the barracks and then become a basis for such forms of violent retaliation. As has previously been stated, the Court is convinced that the nighttime incidence of violent assaults, homosexual rapes, drug and alcohol usage, and gambling in the open barracks far exceed the number of such incidents actually reported.

Very revealing is Assistant Warden Toney's memorandum to Warden Sargent, dated August 10, 1992, which reflects the results of his investigation into the attacks by Mr. Lewis. This memorandum states, in part, as follows:

> During my investigation I am of the opinion inmate Lewis attacked inmate Smith because Smith had reported inmate Lewis to staff for failing to do his job and being involved with drugs and homosexual activi-

ty. Inmate Stewart was attacked because of his history of lugging things up, being radical and also because of some earlier homosexual approaches Stewart had made. Both inmates Smith and Stewart were believed to have been asleep when attacked by inmate Lewis. Inmate Lewis used what appeared to have been a hobby craft knife approximately 3 inches long in the assault. He also had a homemade shank of approximately 7 inches in length in his pocket that was not used but confiscated off of him after the attack.

> In response to this incident, inmate Lewis will be transferred to the Maximum Security Unit and inmate Fletcher, who was alleged by some to have given inmate Lewis the shank, will be transferred to the Maximum Security Unit.

> 8 Barracks will be shook [sic] down thoroughly to make sure no known weapons are in there that could be used in an act of retaliation. It was also advised additional security checks and rounds be made by the Lieutenants and Sergeants assigned to the East and West Halls.

Mr. Smith seeks to recover monetary damages from the defendants for the injuries he sustained at the hand of Mr. Lewis on August 10, 1992. A jury trial has been demanded. Therefore, to the extent that genuine issues of fact exist, those issues must be tried to, and resolved by, a jury. The plaintiff contends that no genuine issue of fact remains with respect to liability and that a jury trial should be held solely to determine damages. The defendants claim that they are entitled to qualified immunity as a matter of law and that the entire action by Mr. Smith should be dismissed. The Court will deal with the immunity issue first.

■■■ Qualified immunity exists in order to "strike[ ] a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 1833, 118 L.Ed.2d 504 (1992); *see also Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994). Therefore, to insure that state actors are not undu-

ly hampered in the exercise of their official duties, § 1983 liability will attach only when their actions can be said to have violated a person's "clearly established" constitutional rights, the existence of which a reasonable person would (or should) have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Mahers v. Harper,* 12 F.3d 783, 785 (8th Cir.1993). For purposes of this doctrine, a right is "clearly established" if "[t]he contours of the right [were] ... sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see also Brown v. Nix,* 33 F.3d 951, 953 (8th Cir.1994). As has been previously discussed, there is no doubt that the constitutional right alleged to be at issue in this case—Mr. Smith's right to reasonable protection from inmate-on-inmate violence—was "clearly established" at the time of Mr. Lewis' assault. The defendants do not dispute this conclusion. Rather, they argue that because they had no way of knowing that this right required them to take measures beyond those outlined in *Finney,* their compliance with *Finney,* if proven, would entitle them to qualified immunity, as they could not be said to have reasonably known that their actions would not be in compliance with the Constitution's requirements. *See, e.g., Givens v. Jones,* 900 F.2d 1229, 1232–34 (8th Cir.1990). The defense of qualified immunity, to be of any value, must usually be disposed of before trial. In the great majority of the cases, the facts are not in dispute and the issue is therefore one of law. This, however, is not such a clear-cut case.

Here the question is: Did the defendant believe on August 10, 1992, that they would not be violating the Eighth Amendment rights of Mr. Smith, and others living in the open barracks, to be free from unreasonable risk of physical assaults by their fellow inmates if they complied with the requirements of *Finney? Finney* did not require officers to be stationed inside the open barracks, but it did require an officer in the hallway, outside the bars, to constantly monitor the two opposing open barracks containing up to 100 inmates each. And, more important for our purposes, *Finney* also required hourly security patrols *inside* those open barracks. The Court repeats that part of the *Finney* opinion:

> Finally, in addition to the officers that are always present in the hallways for visual surveillance of each barracks, a patrol officer enters the barracks on a random basis, inspecting each one at least once an hour at irregular times. This officer actually walks through the barracks checking activity among the inmates as well as locks, lights, latrines and the temperature.

546 F.Supp. at 640.

The plaintiff claims that defendants simply did not comply with this provision and that, therefore, in no event would they be entitled to qualified immunity. He further contends that the law in this area had changed since *Finney,* and before August 10, 1992, and that defendants should have known that the constitutional right of the plaintiff Smith, and other inmates in the open barracks, could not be protected in this context without stationing officers inside those barracks during the nighttime hours. Plaintiff points not only to developments in the law (some of which actually pre-date *Finney* ), but also to the Arthur Young reports, the Department of Justice reports, and to the agreement reached with the Justice Department with respect to the stationing of guards in the open barracks.

The defendants, as previously discussed, argue that expert opinions (even their own) do not establish constitutional rights, and that they had the right to rely on this Court's decision in *Finney* even in August of 1992. The Court, with considerable hesitation, agrees. *See Givens v. Jones, Supra,* 900 F.2d. at 1232–34. So, with respect to the defendants' claims of qualified immunity then, the basic factual issue becomes: Were the defendants in compliance with *Finney* in August of 1992? The Court concludes that they were not.

The Court first notes the obvious: the people making the reports discussed above did not, on the basis of their investigations, believe that the ADC was requiring security patrols inside the open barracks at least once an hour at irregular intervals. Note the

language of the Arthur Young Report quoted above: "The only supervision or surveillance comes from the officer in the main corridor manning the riot gate." And Mr. Miller states: "At the present time, there are insufficient officers to make regular rounds inside the dormitories, particularly in the evening and night shifts." And, frankly, the testimony of the defendants' witnesses did not assure the Court that these very minimal requirements, as set forth in *Finney*, were in fact being followed or even approached.

Over the years the ADC has become more and more aware of the importance of setting forth both its policies and its procedures in clear written form. It has come to recognize the importance of clear and unambiguous orders down the chain of command. Like other modern correctional institutions, it has developed and refined its "Post Orders" so that each officer on each shift knows and understands what is expected of him or her. This does not, of course, mean that all needs can be anticipated, and for this reason such post orders are, by their own terms, intended to be supplemented by "other orders as required." See, e.g., Plaintiffs' Exhibits 7 and 8. But the Court notes that care is taken to include, in detail, every daily routine, duty and responsibility of each officer on the particular post. Despite this fact, the closest the Post Orders placed in evidence can be said to refer, in any way, to the *Finney* requirement of hourly security checks will be found in the following language:

Plaintiffs' Exhibit 6 (West Hall Sergeant Post Orders):

"J. Conduct periodical security checks on all Barracks."

Plaintiffs' Exhibit 7 (Building Security Post Orders for Building Security Captain, "B" shift):

"Responsible for all security checks: (1) to insure that irregular random patrols and searches of all areas of the inner perimeter are conducted."

Plaintiffs' Exhibit 8 (Building Security Post orders for Building Security Lieutenant "B" shift):

"Responsible for security checks: (1) to insure that irregular, and random patrols, searches and security checks are made of

all the areas inside the perimeter and the buildings, to include within barracks."

The quoted language is clearly and obviously inadequate to convey the real essence of the *Finney* security patrol requirement. More importantly, this key *Finney* requirement is nowhere set down or explained in writing in any document or policy statement of the ADC. The defendants acknowledge this, but they maintain, nevertheless, that the policy was known and understood by one and all in the ADC; that the policy was orally communicated to those charged with implementing it; and that that policy was in fact followed in practice. This contention is, however, undercut by the testimony of many officers, some of the defendants, and the inmate witnesses (with the exception of inmate Maxwell).

Mr. Smith contends that security checks were almost never made. The defendants contend that they were made routinely on an hourly basis as required by *Finney*. The Court finds that such security checks were made on an irregular and random basis when other duties and responsibilities permitted, which was not very often, and indeed only rarely. The Court finds that, at least since the beginning of 1992 and continuing to the present (i.e., the time period primarily involved in this litigation), the defendants have not enforced the letter or the spirit of this *Finney* requirement. In making this finding, the Court accepts the defendants' contention (for purposes of this litigation) that "Count" rounds should be considered as "security checks" for the purpose of *Finney*, though it is arguable whether this is a faithful reading of *Finney*. And it also accepts that additional security checks were sometimes made inside of the open barracks. But, taken together, the result falls far, far, short of the "hourly" standard required by *Finney*.

The defendants' own records support this conclusion. The ADC's use of its "C S Form # 14," entitled "Security Check Log," was not made known to the plaintiffs until the very eve of trial, this despite their obvious

importance in this case.[8] Plaintiffs' Exhibits 26 and 30 contain several of these Security Logs. Exhibit 26 contains logs for August 7–10, 1992. Exhibit 30 is the Security Log for August 4, 1992, from 8:00 p.m. until 12:05 a.m. This log shows Sergeant Johnson going into Barracks # 7 at 8:08 p.m., out at 8:14 p.m., and going into Barracks # 8 at 8:15 p.m. and out at 8:17 p.m. It also shows "Counts" being made in Barracks 7 and 8 at 10:00 p.m. ("cleared" at 10:10 p.m.) and at 12:00 a.m. (cleared at 12:05 a.m.). There is no record showing any other security check.

Generally, the Court was impressed by the credibility of Sergeant Johnson, but felt that he was under pressure to support the ADC's claimed adherence to the *Finney* security check requirement while knowing that such was not the case. The result was much ambiguous testimony. At one point, he acknowledged that those entering the open barracks were required to make sure that that fact was documented. And, of course, we find examples of such documentation on Exhibit 30. But, then he had to recognize that the great majority of the security logs reveal no hourly security rounds, so he concluded the logging thereof depended more or less on the officer involved. The Court notes, however, that these security logs are usually not made out by the officers who actually enter the barracks to make "counts" or security rounds. For instance, Officer Troy Morrison appears to have made the notations showing Sergeant Johnson's various entries into Barracks 7 and 8 on August 4, 1992. And Exhibit 26, the logs for August 7–10, 1992, confirms this practice. The entries in the log for August 7, 1992, for the hours from 8:00 p.m. until midnight, were made by COI J.R. Massey. His entries show that Sergeant Veasy made a "security round" through Barracks 7 and 8 at 8:15 p.m. and again at 9:14 p.m., and that a "count" was made at 10:00 p.m. No "security rounds" are recorded on the Security Check Log for the period from midnight until 8:00 a.m. on

August 7, 1992; for the period from midnight until 7:15 a.m. on August 8, 1992; for the period from 8 p.m. until midnight on August 9, 1992; or for the period from midnight until 8:30 a.m. on August 10, 1992, although the last log, which covers the stabbing of Mr. Smith and Mr. Stewart by Mr. Lewis, does show the entry into Barracks # 8 by Warden Toney, Caption Tato, Lieutenant Wood, Sergeant Johnson and "police investigators" at various times after the incident occurred at 2:15 a.m.[9]

The Court notes from the security logs how carefully "counts" were logged. This practice reflects the seriousness accorded this duty in the Post Orders. See Plaintiffs' Exhibits 7 and 8. The Court believes, and so finds on the basis of the evidence, that security rounds, when actually made, would ordinarily, but not always, be entered on the Security Check Logs. At a minimum, this reflects an indifference to the importance of the *Finney* security check requirement.

During the hearing in this matter, the Court took judicial notice of the history of the development of the security requirements for the open barracks in *Finney*. Everyone in that litigation recognized the very serious risks incident to the assignment of 100 persons to these open barracks. Much thought was given to requiring these barracks to be replaced, or at least to require that the number of inmates housed in such barracks be reduced to ninety, and then to eighty. This was found not to be feasible at that time, so *Finney*'s requirement of hourly patrols inside the open barracks (in addition to the outside surveillance) was established as the absolute minimum security arrangements needed to protect the safety of the inmates in the open barracks from assaults by their fellow inmates. The Court has now, in 1995, concluded that such requirements, even if followed to the letter, would be insufficient to protect the Constitutional rights of the inmates. See discussion *supra*. But even

---

8. The Court further notes that the defendants have failed to put forward a plausible explanation for their failure to provide these documents, which, the Court notes, were requested months ago.

9. The Court notes that although the incident is recorded as "fight broke out in 8 Barracks," the evidence reveals no "fight," at least as far as Mr. Smith is concerned. Rather, he was (slashed with the hobby knife by Mr. Lewis as he slept on his bunk).

these minimum requirements were not met by the defendants in this case.

The Court has heard and considered the testimony of the witnesses for both the plaintiff and the defendants and has received and considered the documentary evidence, and finds therefrom that the requirements of *Finney* have not been adhered to, or followed, in recent years, and certainly not since the first of 1992.

Therefore, since the defendants knew, or should have known, that they were not operating the open barracks in compliance with *Finney,* and that their failure to do so exposed the affected inmates (*e.g.* Mr. Smith) to an unreasonable and excessive risk of physical assault, their Motion for Summary Judgment on the basis of qualified immunity must be denied. As a consequence, the Court is not called upon to decide if the defendants, even if they were operating in compliance with *Finney,* should nevertheless be precluded from asserting a claim of qualified immunity because they knew, or should have known, by virtue of federal court decisions and their own work with the Arthur Young Company and the Department of Justice experts, that minimum security procedures for the protection of inmates in the open barracks from physical assaults by fellow inmates would require that officers be physically stationed inside such barracks, at least during the nighttime hours.

Another issue should be discussed. Does this Court's factual finding that defendants knowingly failed to comply with *Finney* completely dispose of the issue of qualified immunity, or may the defendants again submit that issue to the jury, perhaps on written interrogatories? As noted above, defendants *contend* that they operated the ADC in compliance with the *Finney* hourly security patrol requirement. This Court has found to the contrary. But could a different, independent fact-finder, *i.e.* the jury, find *on the basis of this evidentiary record* that defendants were, indeed, in compliance with *Finney?* The Court on the basis of this evidentiary record, concludes that *no reasonable jury* could find for the defendants on this issue. This clearly disposes of the qualified immunity issue. *See* Fed.R.Civ.P. 56(c);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court therefore does not have to deal with the problem that would arise if it were to conclude that reasonable fact finders could differ, *i.e.,* that a reasonable jury could find on this evidentiary record that the defendants were in compliance with *Finney* and believed that they were thereby adequately protecting the Eighth Amendment rights of inmates living in the open barracks. *Compare Bee v. DeKalb County,* 679 F.Supp. 1107, 1112–13 (N.D.Ga.1988).

The plaintiff Mr. Smith is entitled to Partial Summary Judgment with respect to liability on his claim for personal injuries based upon defendants' failure to follow *Finney* and upon their failure to assign correctional officers inside open Barracks # 8. Therefore, only the damages issues will be submitted to the jury.

### THE HOBBY CRAFT KNIFE ISSUE

■ On August 26, 1994, long after the filing of this lawsuit and over two years after Mr. Smith was stabbed by Mr. Lewis using a razor-type hobby craft knife, the defendants changed their Hobby Craft Policy to prohibit the keeping of such dangerous tools in the open barracks. Prior to that date, such obviously dangerous hobby craft tools were permitted to be kept in these barracks by inmates who had received specific permission. Some 200 of the inmates at the Cummins Unit had such hobby craft privileges. However, Mr. Lewis was *not* one of those authorized to possess such equipment. The assumption, therefore, is, as stated above, that the knife he used in these attacks was given or loaned to him by another inmate or that he stole it.

It is undisputed, and the Court so finds, that the defendants knew that no prison official was stationed inside Barracks # 8 on August 10, 1992, or, indeed, at any time before or after that date. It is also undisputed, and the Court so finds, that the defendants knew that certain inmates residing in Barracks # 8 on August 10, 1992, had hobby craft knives or similarly dangerous hobby

craft tools. And defendants knew that their classification procedures were such that inmates such as Mr. Lewis, who was serving a sentence of life without parole for rape and capitol murder by stabbing, and who had a terrible institutional record, could, albeit not often, be assigned to one of these open "medium security" barracks. While the plaintiff has withdrawn his attack on the defendants' classification system in this action, he nevertheless makes the point that the system does permit inmates with records like that of Mr. Lewis to be assigned to the open barracks.

*Finney* did not deal with the ADC's Hobby Craft Policy. But the Department of Justice reports clearly identify the problem created by this policy. At page 15 of Mr. Miller's report of May 2, 1988, we find the following:

> Cummins has no hobby craft shop whatsoever. In most prisons, woodworking and leather work are very popular leisure time activities for inmates and also provides them with a legitimate means of making some money either for use at the commissary or to send home. Recognizing this need, Cummins officials permit a limited number of inmates to work at hobby crafts in the housing units. (Obviously, there is also a limit on the types of tools and materials allowed as well). No matter what limits are in place, the current practice results in inmates possessing implements and materials that are wholly inappropriate from both security and fire safety perspectives in the dormitories. The solution to this problem is not to prohibit hobby crafts, but rather to create a fitting workshop in which they can be pursued properly. This type of popular, constructive activity should be encouraged, but should also be located in an area where proper control can be maintained over tools and appropriate fire safety precautions implemented.

And at page 10 of Mr. Miller's July 2, 1991, report, the following comments are also noted:

> As in many correctional institutions, hobby crafts are a very popular activity with inmates at Cummins. In addition to being a constructive leisure time pursuit, some inmates are able to sell their work, thus generating money for canteen purchases and, in some instances, to send money home to dependents. The problem at Cummins is that no area has been set aside for hobby crafts. Hence, in walking through open dormitories, one observes inmates openly using large scissors, a variety of pliers and other dangerous tools. Cummins officials took great pains to assure me that inmates who desire hobby craft permits are carefully screened; they must keep such implements locked up by their beds when not in use; and that the penalty for misuse or allowed misuse by someone else of hobby craft tools is severe. Notwithstanding these "assurances," it is a very dangerous practice to permit the presence of such implements in general population housing units.

> The solution to this security problem is not to abolish hobby crafts, but rather to find an appropriate locale in which to conduct this worthwhile activity. The Vo–Tech building at Cummins is in the process of being converted for use as prison industries. Warden Sargent thinks that he may be able to create an appropriate hobby craft area in this remodeled building. I would certainly encourage the Warden to pursue that idea. If that idea proves fruitless, then I would urge that some other area be found that is reasonably accessible to inmates with hobby craft permits and also provides adequate security for hobby craft tools, when not in use.

Warden Sargent's memorandum of May 26, 1992, to Assistant Director Larry Norris, deals with the issue as follows:

> In Mr. Miller's report, he goes into great detail regarding the security risks of having hobby craft tools and materials within the unit living areas. As you are aware, we have discussed this matter on numerous occasions. At our recent meeting on this issue, it was determined the building now utilized for Inside Maintenance would be most appropriate as a hobby craft area. Inside Maintenance would be relocated to the recently vacated Vo–Tech building. We also discussed/determined those hobby crafts requiring tools and materials (i.e. hammers, scissors, screw-drivers, chisels,

flammables, toxic materials and so forth) which could be used/converted as weapons against a person would be moved to this location. All other hobby crafts would remain in the living areas. I am presently working out the logistics and cost analysis to initiate this move. Once this has been accomplished, it will then be a matter of the availability of funds to complete the move.

It is clear from the evidence that the defendants' Hobby Craft Policy, combined with its failure to station officers within the open barracks, created a serious and obvious risk of danger to Mr. Smith and other inmates housed in the open barracks. The defendants were aware that both practices had been severely criticized by Mr. Miller as creating serious risks. And in-house, defendants had apparently been discussing the hazards created by their Hobby Craft Policy even before Mr. Miller's report. See Warden Sargent's memorandum of May 26, 1992, to Mr. Norris, quoted above. Finally, by that date, defendants were taking steps to solve the problems on a long range basis: find a suitable building and move the entire hobby craft program into it, thereby removing from the barracks all of the hobby craft knives and other dangerous tools. This new policy, however, was not implemented until August 26, 1994, over three years after Mr. Miller's recommendation, and over two years after Mr. Sargent's memorandum! The Court sees absolutely no justification for the delay in removing the hobby craft tools that were known to pose such a danger to the inmates living in these open barracks.

Of course, such hobby programs serve useful and legitimate penological objectives, but defendants pre-August 26, 1994, program was fundamentally flawed and unacceptable, given the overall circumstances. Nevertheless, a decision was consciously made by defendants to delay dealing with the problem until the new arrangements had been completed.

The Court understands the difficulty of completely excluding contraband and weapons from the open barracks. But forbidding such weapons in the form of officially-sanctioned hobby craft tools is an obvious, and an extremely important, first step. And the stationing of officers *within* such barracks, combined with a more aggressive search and "shakedown" system, should reduce the risk of incidents such as that which occurred on August 10, 1992, to an acceptable, and constitutional level.

Generally, a "pervasive risk" can not be established by a single incident or isolated incidents. The Court has already found that the number of reports of violent assaults are far fewer than the number of actual violent assaults by inmates on other inmates within the open barracks. The numbers of actual knifings or stabbing is not the sole measure, although the record reflects several such incidents.[10] See Plaintiffs' Exhibit 18 and Plaintiffs' Exhibit 35. And the Court has already noted that inmate Lewis stabbed one or two other inmates while he was at the Tucker Unit some years ago. And, just as one need not await the consummation of threatened injury to obtain injunctive relief, *Farmer v. Brennan, supra,* —— U.S. at ——, 114 S.Ct. at 1983, neither should such an obvious situation as we have here be considered inadequate as a predicate for monetary relief simply because the defendants have been relatively lucky in that their Hobby Craft Policy has not produced more injuries or deaths. *See id.* at —— —— ——, 114 S.Ct. at 1981–83. The Court doubts that a prison policy permitting inmates to keep loaded guns in the barracks would be an insufficient basis to sustain an action by an inmate who was shot simply because no other, or only a few other inmates, had previously been shot by such guns.

The Court finds and concludes, in connection with Mr. Smith's complaint, that the risks occasioned by defendants' Hobby Craft Policy, taken in context with defendants' other, related, policies, created not only an obvi-

---

**10.** Mr. Enomoto, presently, United States Marshall for the Eastern District of California and a correctional expert, worked with the Arthur Young organization in evaluating the ADC back in 1986 and has visited the institution recently.

He identified some twenty-three stabbings in the period between 1989 and 1992 but was uncertain as to the areas within which such incidents occurred.

ous risk of serious harm but a pervasive risk of such harm, and that accordingly he is entitled to relief under § 1983. *See id., cf. Hutto v. Finney,* 437 U.S. 678, 681–82 n. 3, 98 S.Ct. 2565, 2569 n. 3, 57 L.Ed.2d 522 (1978).

### *MONETARY RELIEF UNDER § 1983*

Mr. Smith seeks partial summary judgment on his Eighth Amendment claim based upon the defendants' Hobby Craft Policy. He claims that no genuine issues of fact exist with respect to liability and that only the damages issues should be tried out before a jury. The Court agrees.

Based upon the submissions of the parties (to the extent that they are consistent with the Court's own factual findings), the stipulation admitted into evidence, and the findings made in this memorandum, the Court concludes that defendants' Hobby Craft Policy as it existed on August 10, 1992, combined with the defendants' policy of stationing *no* correctional officers inside open Barracks # 8, and ADC's classification system for the assignment of inmates to the open barracks, created an obvious, excessive, and unacceptable danger and risk of serious bodily harm to the plaintiff and other inmates living in that barracks; and that the defendants were not only aware of the facts, and aware of their policies and of the effect of such policies, but also knew that said policies, alone and in combination, created a substantial risk of danger and serious harm to the inmates housed in Barracks # 8 at the hands of their fellow inmates. This pervasive risk of harm from fellow inmates, combined with defendants' failure to timely respond to that risk, compel the conclusion that defendants recklessly disregarded Mr. Smith's right to be free from unreasonable risk of violent physical attack. They were, in sum, deliberately indifferent to Mr. Smith's constitutional rights under the Eighth Amendment. Therefore partial summary judgment will be entered in favor of plaintiff Smith on the liability (including causation) issues, leaving only the damage issues for trial to a jury.

Plaintiff also seeks declaratory and injunctive relief with respect to defendants' Hobby Craft Policy. However, as noted above, on August 26, 1994, the defendants changed their Hobby Craft Policy. The new policy prohibits possession of hobby craft knives and other dangerous hobby craft tools within the open barracks. The new policy appears to meet constitutional muster. Therefore, the Court declines to award plaintiff any equitable relief with respect to the hobby craft issue.

### *EQUITABLE AND INJUNCTIVE RELIEF*

The Court considered deferring entering a final order setting forth the specific obligations of the defendants with respect to security and staffing in the open barracks in order to give the parties, and particularly the defendants, the opportunity to have additional input on these issues. However, having reviewed the history of these issues, including the recommendations of the Arthur Young report and the Department of Justice reports, the Court concludes that it is sufficiently advised and, therefore, will contemporaneously herewith enter a declaratory judgment and an appropriate injunction.

The Court recognizes that conditions can change rapidly. For instance, defendants have spoken of their desire to reduce the number of inmates housed in the open barracks to approximately eighty. They have also considered splitting the large dormitories, thereby creating living units of forty to fifty inmates. If significant changes are made in the future during the life of the injunction, then appropriate changes in staffing and security will likewise probably have to be made. The Court, of course, will be available during the life of the injunction to consider any changes requested on the basis of changed conditions.

### *IS ADDITIONAL INJUNCTIVE RELIEF REQUIRED?*

The evidence made clear the need for quick-response procedures as an integral part of the overall security arrangements for the open barracks. Mr. Smith's testimony about the events immediately following the attack upon him reveals some of the deficiencies of the existing system. He states he walked, while bleeding profusely, out the gate and through the hall where an officer was writing at a desk and then past another

officer who was talking on the telephone. Meanwhile, Mr. Lewis was attacking and killing Mr. Stewart. And consider: the officer stationed in the hall between the barracks is not permitted by defendants' own rules to enter the dormitory because he possesses the keys to the barracks. So, all he can do is open the door to let Smith out. Under defendants' rules, he may not enter the barracks or go to the aid of Mr. Stewart, who is being murdered before his eyes.

Effective communication is one of the obviously essential elements of any quick-response program. New communication devices and other technologies can surely help, but cost must be carefully considered.

And defendants' "shakedown" and contraband policies are also implicated as part of any effective security program for the open barracks. The use of stationary and hand-held electronic devices can, and do, play a significant role.

Plaintiff Smith asks the Court to make specific orders with respect to these matters. But, the Court feels that it will be better to call upon the defendants to report to it as to how they intend to handle these matters *after* the new staffing requirements have been met and are in place. A report covering these areas must be filed with the Court on or about May 1, 1995, with copy to plaintiffs' attorneys. The plaintiffs will have until May 15, 1995, to comment thereon or to object thereto.

Partial Summary Judgment will be entered this date in favor of Mr. Smith on his claims for damages under § 1983, leaving only the damage issues to be tried to a jury. A Declaratory Judgment and Injunction will also be entered this date upon Mr. Rudd's claim for equitable relief.