Everett HADIX, et al., Plaintiffs,

v.

Perry JOHNSON, et al., Defendants.

Civ. A. No. 80–73581.

United States District Court,
E.D. Michigan, S.D.

April 21, 1989.

Patricia A. Streeter, Michael J. Barnhart, Detroit, Mich., for plaintiffs.

Thomas C. Nelson, Asst. Atty. Gen., Corrections Div., Lansing, Mich., for defendants.

### MEMORANDUM OPINION AND ORDER

FEIKENS, District Judge.

Before me is Plaintiff's Motion to Clarify Section VI, Paragraph 13, of the consent judgment entered in this case on May 13, 1985. The consent judgment settled the large portion of a class action brought against the Michigan Department of Corrections (Department). The plaintiff class consists of inmates who are now or in the future will be confined at the Central Complex of the State Prison of Southern Michigan. The consent judgment, some forty pages in length, has twelve sections covering various aspects of prison life including such areas as sanitation, fire safety, overcrowding and protection of inmates from harm, use of volunteers, prison management, inmate legal mail, compliance and inspection procedures and access to the courts.[1]

Section VI, Paragraph 13 (paragraph 13), concerns class members' rights to possess and store legal papers and law books in their cells. It reads as follows:

> Any property limitation imposed on prisoners shall not apply to legal papers and law books except that if the quantity thereof conflicts with important institutional goals such as security or fire safety, a limitation may be sought through the administrative hearing process. The standard for imposition of a limitation shall be whether the material in question is reasonably necessary to assist the prisoner with respect to his pending litigation.

Consent Judgment, Section VI, Paragraph 13.

Plaintiffs' motion challenges the Department's use of a blanket standard, the "one footlocker rule," to determine the existence of a security or fire safety hazard.[2] It also seeks clarification of the procedures and standards to be applied to the administrative hearings required by paragraph 13.

I conclude that the one footlocker rule is not inconsistent with the consent judgment and that the Department may seize excess

---

1. For a detailed history of this case, *see Hadix, et al. v. Johnson, et al.,* 694 F.Supp. 259 (E.D. Mich.1988).

2. The one footlocker rule limits prisoner property to that which can be "placed in one state-issued duffel bag and one footlocker, if purchased by the prisoner." *See* P.Ex. 3 (Department Policy Directive (P.D.) 53.01(II) (1985)).

legal material prior to completing an administrative hearing. I find, however, that the Department has not conducted the required administrative hearings in accordance with paragraph 13. Therefore, I establish procedures for conducting future hearings.

## I. *Legal Framework*

■ Before addressing plaintiffs' contentions, I set forth the legal framework. A consent decree is considered to be a contract between the parties. Thus, it has been held that a consent decree, like a contract, must be construed within its four corners. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). The words of a consent decree, like any writing, have meaning only in the context in which they are written. The court must look to the circumstances under which a contract was formed, and the purposes to be served by it, to determine its proper construction. *See* Corbin, Contracts, Section 542. Moreover, a consent judgment is a judgment of the court which the court has broad authority to enforce. *United States v. City of Detroit*, 476 F.Supp. 512, 520 (E.D.Mich. 1979) (Feikens, J.) (court has broad range of equitable powers to enforce its judgments).

This is particularly true given the complex consent judgment here. Its execution is to occur over a period of years. Paragraph 5 of the introduction recites that I have retained jurisdiction to enforce the consent judgment. Several of its sections require periodic submissions to the court. Section XI, entitled "Compliance," sets forth detailed provisions establishing my role in monitoring compliance and in settling compliance disputes. The parties have established an expanded role for the court to fulfill the objectives of the consent judgment. Therefore, I must have "a degree of flexibility in enforcement of the judgment that does not result in a modification; the flexibility is within 'the four corners' rule of *Armour* because the consent judgment itself provides for it." *N.Y.S. Ass'n For Retarded Children v. Carey,*

596 F.2d 27, 37 (CA2 1979), *cert. denied sub nom. Coughlin, Commissioner, New York State Office of Mental Retardation and Developmental Disabilities, et al. v. New York State Association for Retarded Children, Inc., et al.,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

## II. *One Footlocker Rule*

■ Plaintiffs maintain that the Department may not apply a blanket rule when determining whether a prisoner's legal materials pose a threat to security or fire safety. I do not agree. The State of Michigan, through the Department, has the sole responsibility to determine what conditions within its prison system threaten security or fire safety. *Hadix v. Johnson,* No. 86–1701, slip op. at 14 (CA6 March 17, 1988) [842 F.2d 331 (table)]. The Department has chosen to fulfill this responsibility by establishing a standard applicable to all prisoners, the "one footlocker rule." The Department's approach is neither unreasonable nor unduly burdensome to prisoners' right of access to the courts.

■ At the evidentiary hearing conducted on this motion, Dr. Richard Hinds, the Department's fire safety expert, testified that legal materials chiefly threaten fire safety. There are two necessary conditions to a fire: a source of ignition, and fuel. Paper, legal or otherwise, is fuel. One department-approved footlocker, fully loaded, can stow over a hundred pounds of paper. I cannot fault the Department's desire to limit prisoners to one footlocker of paper. Moreover, the one footlocker rule has appeal because it presents a bright line test; it is easy for both prisoners and guards to comprehend and apply. Paragraph 13 balances the prisoners' right of access to the courts against the Department's interest in security and fire safety. The balance struck by the Department with the one footlocker rule may, or may not be, the optimal balance, but I am not disposed to disturb it. Thus, a class member may possess and stow in his cell any legal papers or law books that come within the one

footlocker rule.[3]

## III. Procedure With Respect to Excess Legal Materials

Plaintiffs raise two related concerns with respect to the Department's present procedure for handling excess legal materials. First, plaintiffs maintain that paragraph 13 requires the Department to conduct the administrative hearing prior to seizing excess legal materials. The Department's present practice is to remove excess materials pending the administrative hearing. Second, plaintiffs allege that the hearing process is subject to inordinate delay.

■ Plaintiffs' first complaint is without merit. By definition, excess legal papers and law books pose security or fire safety hazards. The consent decree was not intended to require the Department to attend disaster idly while an administrative hearing is completed. However, with the authority to seize excess legal materials immediately comes the concomitant obligation to proceed diligently with the required administrative hearing. The testimony of Karl Battle-el and Pepper Moore indicates that the Department has been remiss in this respect.

On September 29, 1988, while Battle-el was being treated at a local hospital, a Department officer completed a form entitled "Notice of Intent to Conduct an Administrative Hearing" with respect to Battle-el's legal papers. P.Ex. 7. It appears that on that day, or shortly thereafter, Battle-el's legal papers were seized. On October 30, 1988, Battle-el filed the first of several grievances regarding his legal papers. On November 2, 1988, Battle-el received the Notice of Intent. P.Ex. 7. On December 22, 1988, the last of Battle-el's grievances was returned to him. The following day, Battle-el received notice from the Clerk of Ingham County Circuit Court indicating that a lawsuit he had filed there

had been dismissed for lack of service. P.Ex. 8. Battle-el testified that he was unable to complete service because he could not access his legal papers. On January 9, 1989, Battle-el's papers were returned to him. The Department did not conduct a hearing with respect to Battle-el's legal materials.

Moore's legal papers were seized May 5, 1988. An administrative hearing was convened on May 13, 1988 and completed on June 6, 1988. On June 9, 1988, the hearing officer submitted his report. P.Ex. 1. The hearing officer ordered the return of materials related to Moore's criminal conviction, and to his participation in this suit. These materials were returned to Moore. The hearing officer also ordered returned materials related to cases Moore was preparing to file. Yet, these materials were not returned. Indeed, Moore received these materials only after the Department's failure was revealed at the hearings on this motion and I directed the Department to explain the lapse.

I find from this evidence that the Department has failed to comply fully with the terms of paragraph 13. Paragraph 13 requires that an administrative hearing follow the seizure of excess legal materials. No hearing was held during the more than three months that the Department retained Battle-el's property. As a consequence, his state court lawsuit was dismissed. Moore's difficulty was not in obtaining an administrative hearing, but in receiving the relief that the hearing officer found him entitled to. The Department did not suggest at the hearing on this matter that the cases of Battle-el or Moore were aberrational. Indeed, no attempt was made by the Department to rebut the testimony offered by either prisoner. I am also struck by the timing of the return of their papers. Battle-el's papers were returned only three days prior to commencement of the hear-

---

**3.** The Department's present practice, upon a finding that a prisoner possesses excess legal materials, is to seize all of the prisoner's legal materials, both the excess and the materials conforming to the one footlocker rule, pending the administrative hearing. The Department has determined in P.D. 53.01(II) that legal materials stowed in the prisoner's single footlocker pose no threat to security or fire safety. In the future, therefore, only excess legal materials not contained within the single footlocker may be seized and subjected to an administrative hearing. The legal materials contained within the single footlocker may not be seized.

ings on this motion. As indicated above, the Department returned Moore's papers only after my inquiry. While the correlation between the evidentiary hearing on this motion and the Department's increased attention to its obligations under paragraph 13 may be purely coincidental, a mephitic odor pervades. I conclude that further guidance concerning the procedural aspects of paragraph 13 is needed.

■ Henceforth, the Department shall commence and complete the required administrative hearing within thirty days from the date it seizes a prisoner's legal papers or law books. Moreover, the prisoner shall have two days from the date of seizure to present the Department with a list of legal materials needed to complete legal work due prior to the running of the thirty-day period. With respect to these materials only, the Department shall convene and complete the required administrative hearing within seven days of the date that the list is received from the prisoner.

It is implicit in the class members' right to an administrative hearing under paragraph 13 that the hearing will be convened and completed with reasonable promptness. What is reasonable depends on balancing class members' right of access to the courts and the Department's interest in maintaining secure prisons. *Procunier v. Martinez,* 416 U.S. 396, 420, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974) ("The extent to which [a prisoner's right of access to the courts] is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials.") I have chosen thirty days for two reasons. First, a prompt hearing is needed given that class members' right of access to the courts has been, and may again be, compromised by delay in conducting the adminis-

trative hearing. Second, the Department has indicated that a thirty-day requirement would not impose a substantial burden. Marjorie Van Ochten, Administrator of the Department's hearings division, testified that in most cases, excess legal materials hearings can be completed within thirty days.

The burden imposed on the Department by the seven-day hearing requirement is not excessive. Both Van Ochten and Thomas Craig, the Department hearing officer who conducted Moore's legal paper hearing, testified that the large part of time spent on excess legal material hearings is consumed by the need to organize the prisoner's property. This process is minimized in the seven-day hearing because the prisoner must specifically identify the legal materials needed, and because the seven-day hearing would not ordinarily encompass all of a prisoner's legal material, but only those needed in connection with specific due dates.

## IV. *Clarification of Terms*

There is little real conflict between the Department and plaintiffs with respect to the meaning of the phrase "reasonably necessary to pending litigation." Van Ochten has acknowledged that the Department treats as "pending" litigation any lawsuit that a prisoner has filed or is preparing to file. Letter from Van Ochten to the Court (January 24, 1989).[4] This comports with plaintiffs' interpretation of "pending litigation." Plaintiff's Post Hearing Brief at 5 nn. 6, 13.

There is a superficial conflict between paragraph 13's "reasonably necessary" standard as construed by plaintiffs[5] and P.D. 53.01 which provides that the hearing officer is to determine if the material is "essential" to pending litigation. P.Ex. 3 (P.D. 53.01(III)(B)(25)). I directed Van Ochten to prepare a written statement ad-

---

4. The Department also recognizes a prisoner's right to retain excess legal material needed for, or related to, a pending lawsuit prepared by the prisoner on behalf of another prisoner pursuant to a proper legal assistance agreement between the first prisoner and the second. Letter from Van Ochten at 2.

5. Plaintiffs contend that the hearing officers must accept prisoners' representations as to the materials needed for pending litigation.

dressing the application of P.D. 53.01. Letter to Van Ochten Confirming Verbal Order of January 17, 1989. In response, Van Ochten added the following gloss to subsection (III)(B)(25):

> [H]earing officers have been given verbal guidance on several occasions and have been instructed to construe these standards liberally, in favor of the prisoner, if he states that something is needed or relates to a lawsuit he is pursuing and *it appears on the face of the matter* that there is indeed a lawsuit pending or being prepared for filing.

Letter from Van Ochten at 2 (emphasis added).

Thus, the Department will accept a prisoner's representation as to materials needed unless it is belied by a cursory examination of the material in question.[6]

The remaining dispute concerns the Department's policy requiring prisoners to show that the law books they wish to retain are not available in the prison law library. Presumably, such books are not "reasonably necessary" because the prisoner can use them in the library. Paragraph 13 does not expressly distinguish between law books available in the library and those that are not. If the parties had intended Section VI, Paragraph 13, to contain such a distinction, then it would have been stated expressly therein, especially given the detailed treatment of library access issues in paragraphs 1–8 of the same section.

I also take note of the high degree of difficulty that attends use of the prison library. *See Hadix,* 694 F.Supp. at 266–269, 283, 291. The length of time it takes to be "called out" to the library, combined with the high demand for library materials, highlights the prisoners' need to have their own copies of library materials. Testimony of hearing officer Craig adds to the unreality of the Department's position. Craig testified that he relied solely on the list of publications supposedly available in the library, and did not check to determine if the books he confiscated were in fact available. Given the frequent need to repair or replace lost, destroyed or damaged volumes, *see Hadix, supra* at 267, the hearing officer's list is likely to be unreliable. Therefore, I conclude that the availability of law books in the prison library is immaterial to determining whether the law book is "reasonably necessary" within the meaning of paragraph 13. The sole test for law books, like legal papers, is whether "on the face of the matter" the law book is "needed for" or "related to" pending litigation.[7]

Finally, I address plaintiffs' suggestion that prisoners are entitled to retain as legal papers or law books a bare necessity of supplies such as pens and pencils, "whiteout," writing pads and the like. The Department may treat such materials as personal property. The general approach I have adopted with respect to paragraph 13 is, to the extent possible, to require prisoners to self-select the materials they will retain. This self-selection occurs naturally as prisoners conform to the one footlocker rule.[8] Prisoners desiring to keep writing

---

**6.** The limited nature of the hearing officer's examination of the legal materials suggests that the hearing officer will have little ability to share a prisoner's legal strategy with the Department as plaintiffs fear. If the hearing officer learns that strategy, he has ventured beyond his role in the excess legal materials hearing.

**7.** Collections of Xerox cases and exemplars of pleadings and forms used in cases previously filed by the prisoner, commonly known as "brief banks," have been seized summarily on the theory that the prior research can be readily repeated in the library. As I have rejected this approach with respect to law books, I reject it with respect to brief banks. Like other legal materials, the rule is that a prisoner may possess a brief bank to the extent that it comes within the one footlocker rule. To the extent that a brief bank violates the one footlocker rule, the prisoner may retain only such specific Xerox cases or exemplars which on the face of the matter appear to be needed for, or related to, pending litigation.

**8.** The rational prisoner will protect his more important legal materials by placing them in the single footlocker allowed under P.D. 53.01(II). Prisoners who gamble with the one footlocker rule by filling their footlocker with relatively unimportant legal materials run the risk that the more precious legal materials thereby exposed to seizure as excess materials will not survive the administrative hearing. Prisoners who so gamble and lose will not find this Court sympathetic to their plight.

supplies on hand will have to discard other less desirable property. This is a far more sensible approach than my, under the guise of interpreting paragraph 13, becoming the supply master for the prison.

## ORDER

Pursuant to Section VI, Paragraph 13, of the consent judgment:

(a) Prisoners may stow in their cells legal papers and law books ("legal materials") satisfying the "one footlocker" rule as promulgated in P.D. 53.01(II) and legal materials so stowed may not be seized on account of security or fire safety;

(b) Excess legal materials shall be those legal materials not conforming to the "one footlocker" rule;

(c) The Department may seize excess legal materials without first conducting an administrative hearing;

(d) The Department shall convene, and complete, an administrative hearing within thirty days from the date it removes excess legal materials from a prisoner's cell;

(e) The prisoner whose excess legal materials have been seized shall have two days from the date of seizure to present the Department with a list of legal materials needed to complete legal work due prior to the running of the thirty-day period set forth in paragraph (d);

(f) With respect to excess legal materials listed by a prisoner pursuant to paragraph (e) only, the Department shall convene and complete an administrative hearing within seven days of the date that the list is received from the prisoner;

(g) "Pending litigation" shall mean any lawsuit filed or in preparation for filing before any court or administrative agency, state or federal. "Pending litigation" shall include any lawsuit filed or in preparation for filing by one prisoner on behalf of a second prisoner pursuant to a written legal assistance agreement recognized by the Department;

(h) Legal materials shall be deemed to be "reasonably necessary" to pending litigation if on the face of the matter they appear to be needed for, or related to, litigation that is "pending" within the meaning of paragraph (g);

(i) The Department may not confiscate at the administrative hearing a prisoner's excess materials on account of the availability of such materials or their equivalent in the prison library. The sole standard to be applied at the administrative hearing is that described in paragraphs (g) and (h);

(j) The Department may treat pens, pencils, "whiteout," legal pads and all writing supplies as personal property not subject to the limitations imposed by Paragraph 13.

(k) The Department shall provide each hearing officer with the hearings division a copy of this Memorandum Opinion and Order and direct each officer to familiarize himself with its contents.[9]

IT IS SO ORDERED.

---

9. Although hearing officer Craig had conducted excess legal paper hearings, he testified that the Department had not called Section VI, Paragraph 13, to his attention. Apparently, officer Craig read paragraph 13 for the first time during his testimony at the hearing on this motion.