Everett HADIX, et al., Plaintiffs,

v.

Perry JOHNSON, et al., Defendants.

No. 80–73581.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 1, 1996.

---

6. *Id.*

7. *See* docket entry no. 31.

8. *See* docket entry no. 34.

10. *See* docket entry no. 35.

Patricia A. Streeter, Detroit, MI, for Plaintiffs.

Susan Przekop–Shaw and Leo Friedman, Assistant Attorneys General, Lansing, MI, for Defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

## I. BACKGROUND

### A. Issues

Defendants move to terminate relief ordered by a consent decree entered into and approved by me in 1985. Numerous remedial orders were triggered by the mandates of the consent decree. References to these matters are recorded in *Hadix* cases: 694 F.Supp. 259 (E.D.Mich.1988), 712 F.Supp. 550 (E.D.Mich.1989), 740 F.Supp. 433 (E.D.Mich.1990), 792 F.Supp. 527 (E.D.Mich. 1992), and 896 F.Supp. 697 (E.D.Mich.1995).

Defendants' motion is based on the Prison Litigation Reform Act ("PLRA" or "the Act"), effective as of April 26, 1996. The specific section of the Act on which defendants rely is 18 U.S.C. § 3626(b)(2), which reads:

> In any civil action with respect to prison conditions, a defendant or intervenor shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Defendants contend that § 3626(b)(3)[1] does not apply to this case. Intervenor,[2] the U.S. Department of Justice, contends that § 3626(b)(3) is applicable and that, without it, the statute is unconstitutional.

Thus defendants and the intervenor raise two issues and both must be addressed. Defendants argue that the Act terminates the consent decree and orders stemming from the decree because the consent decree was not based on findings by the court that the relief afforded was narrowly drawn, extended no further than necessary to correct the violation of the Federal rights involved, and is not the least intrusive means to correct the violation of the Federal right.

Intervenor argues that what saves the termination provisions of the Act from being unconstitutional is § 3626(b)(3), which prohibits termination if the court makes findings of constitutional violations and then uses the

---

1. That section provides:
   Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

2. The United States may intervene as of right when the constitutionality of any Act of Congress affecting the public interest is at issue pursuant to 28 U.S.C. § 2403.

requisite tests to determine whether such relief shall continue.

Plaintiffs argue that the PLRA violates separation of powers principles, as well as their due process and equal protection rights under the U.S. Constitution. I need only address one of these issues: Is the constitutional doctrine of separation of powers implicated in the PLRA as the defendants and the intervenor seek to apply it to this case?

Also pending before me on remand is defendants' motion to terminate the consent decree under Fed.R.Civ.P. 60(b), on which I originally ruled in an opinion on March 14, 1995.

## B. *Hadix Consent Decree*

In 1980 a complaint was filed by prisoners of the State Prison of Southern Michigan ("SPSM") against officials of the State of Michigan alleging that conditions of their confinement violated their constitutional rights. The plaintiffs were certified as a class in 1981, and ten other cases filed between 1979 and 1985 raising similar issues were consolidated with *Hadix.* In 1985, after numerous conferences between the parties, a comprehensive consent decree was entered into, filed, and approved by me.

A sampling of prison cases reveals that the constitutionality of the areas at the heart of this judgment continue to be extensively litigated in other jurisdictions throughout this nation. *See,* for example, the following cases raising constitutional issues obviated by the consent decree here:

**Sanitation, Safety and Health:** *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (While the Constitution does not mandate comfortable prisons, "neither does it permit inhumane ones." Since inmates are forced to be there, and are stripped "of virtually every means of self-protection and foreclosed their access to outside aid" prison officials "are not free to let the state of nature take its course.");

**Health Care:** *Madrid v. Gomez,* 889 F.Supp. 1146 (N.D.Cal.1995) (Where prison official hired a visiting psychiatrist for periodic visits and then substituted a psy-

chiatrist who resigned after one month, further substitution of nine on-call psychiatrists still did not meet the mental health needs of prisoners in a population of 1,000 to 1,500 in the Security Housing Unit alone.);

**Fire Safety:** *Masonoff v. DuBois,* 899 F.Supp. 782, 789 (D.Mass.1995) ("There is no question that fire safety is a legitimate concern under the Eighth Amendment. . . .");

**Overcrowding and Protection from Harm:** *LaMarca v. Turner,* 995 F.2d 1526 (11th Cir.1993) (Pervasive risk of harm was found where prisoners were exposed to constant violence in dark, overcrowded cells.); *Smith v. Norris,* 877 F.Supp. 1296 (E.D.Ark.1995) (Prison must take reasonable measures to protect inmates, including regular spot checks of open barracks.); *Choate v. Lockhart,* 7 F.3d 1370 (8th Cir. 1993) (Work assignments are considered conditions of confinement subject to scrutiny under the Eighth Amendment.);

**Access to Courts:** *McMaster v. Minnesota,* 819 F.Supp. 1429 (D.Minn.1993), *aff'd,* 30 F.3d 976 (8th Cir.1994) (Where plaintiffs allege specific actions, such as ransacking the cells of plaintiffs and layoffs in prisoner-staffed jobs, taken by prison officials to deter their lawsuit, a claim has been stated upon which relief may be granted.); *Hodges v. Jones,* 873 F.Supp. 737 (N.D.N.Y.1995) (While jailhouse lawyers do not have a constitutional right to that status, they may challenge any official action which impedes them from aiding other prisoners);

**Food Service:** *Williams v. Coughlin,* 875 F.Supp. 1004 (W.D.N.Y.1995) (Where prisoner alleged that he was denied food for two consecutive days, an Eighth Amendment challenge may be mounted.);

**Management:** *Smith v. Norris,* 877 F.Supp. 1296 (E.D.Ark.1995) (Where 92 prison guard positions were needed for adequate supervision of open barracks, an Eighth Amendment violation existed.);

**Mail:** *Muhammad v. Pitcher,* 35 F.3d 1081 (6th Cir.1994) (Prison's policy of treating mail to inmate from state Attorney General as ordinary mail and opening

it was invalid, as it burdened inmate's First Amendment rights.); and *Bieregu v. Reno,* 59 F.3d 1445 (3d. Cir.1995) ("The pattern and practice of opening plaintiff's properly marked incoming mail outside his presence ... violates the Constitution.") [3]

The parties themselves found the purpose of the decree so important that they spelled it out in Paragraph 3 of the introduction to the decree: "The provisions contained herein are intended by the parties to assure the constitutionality of the conditions under which prisoners are incarcerated at SPSM–CC."

█ The significance of this consent decree [4] can not be overstated. The plaintiff class and the defendant, Michigan Department of Corrections, with this court's involvement, labored between 1981 and 1985 to reach an agreement which recognized the existence of constitutional violations in prison conditions and spelled out terms in intricate detail as to how these conditions would be remedied. Under Fed.R.Civ.P. 52(a) such a consent decree or judgment does not require court findings. *U.S. v. Scholnick,* 606 F.2d 160 (6th Cir.1979). The consent judgment's terms provide for the judgment without the necessity of making constitutional findings. Such a judgment has the same res judicata effect as a judgment after trial unless there is a reservation of issues discerned from the four corners of the decree. *Epic Metals Corp. v. H.H. Robertson Co.,* 870 F.2d 1574 (Fed.Cir.1989), *cert. denied,* 493 U.S. 855, 110 S.Ct. 160, 107 L.Ed.2d 117 (1989).

It would therefore be improper to conclude from this settlement that no constitutional violations exist. The strength of a consent decree is that it allows parties to save the exhausting time, money, and resources involved in making this finding of past violations in order to concentrate on present conditions.[5] By now requiring termination of this judgment unless those constitutional findings are made, the PLRA imperiously transforms a consent decree's strength into a nullity.

If violations no longer exist at SPSM, the consent decree can be terminated according to its own terms. The judgment provides that "[a]fter Defendants have complied with all of the provisions of this Consent Judgment, Defendants may apply to terminate the jurisdiction of the Court." Consent Decree, § XI, 33. Consistent with this possibility, I have repeatedly sought to secure finality. In a March 14, 1995 opinion, I ruled that I would consider defendants' motion for termination of this judgment upon a review of their substantial compliance with the terms of this decree within 60 days of December 31, 1996.

### C. *Defendants' Rule 60(b) Motion for Modification*

In 1994 defendants filed a motion under Fed.R.Civ.P. 60(b) for modification of the consent decree. Based on the testimony of the Director of the Department of Corrections and the Warden of SPSM that they could no longer comply with certain elements of the Out-of-Cell Activity Plan, I held that

---

3. The final areas of the decree cover the presence of volunteer groups, operations, compliance with the decree, and inspection of the facilities under the decree. Supervision over health care and access to the courts was transferred by the U.S. Court of Appeals for the Sixth Circuit to now-Chief Judge Richard A. Enslen in the Western District of Michigan in 1992 and 1993, respectively.

4. With the abolition of the distinction between law and equity, the terms "consent judgment" and "consent decree" are often used synonymously. But the term consent judgment is more comprehensive and includes "decree." In this case consent of the parties and the approval of the court make this more aptly a consent judgment.

5. Congressional support for consent judgments is found in the Civil Rights of Institutionalized Persons Act. It provides that the U.S. Attorney General may institute a civil action against any state or political subdivision thereof "for such *equitable relief* as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges, or immunities" if the state "is subjecting persons residing in or confined to an institution ... to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States...." 42 U.S.C. § 1997a (emphasis added). *See also* 42 U.S.C. § 1997b(a)(2)(B), which supports "informal methods of conference, conciliation, and persuasion...."

modification was required and relieved defendants of certain requirements altogether. Specifically, I eliminated the requirement for a capacity of prisoners in the *Hadix* facilities as well as the requirement for a specific proportion of capacity for levels of segregation. Modification also included adjusting percentage requirements for compliance, substituting comparable groups for involvement in activities, and changing yard assignments. Last, to facilitate finality, I held: "For any provision of the plan involving a numerical measure of compliance, defendants may demonstrate compliance for each *Hadix* facility separately, or for all *Hadix* facilities considered in combination."

### D. *Rufo Standard for Modification*

■ My determination that some modification was appropriate because of significant changes in factual circumstances was mandated by the Supreme Court's decision in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). In that case, the Court held that "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Id.,* 502 U.S. at 384, 112 S.Ct. at 760. Faced with a consent decree which provided for construction of a new jail with single cells and a motion by the prison officials under Rule 60(b) to modify the consent decree to allow double-bunking in the new jail, the Court, in a 6–2 opinion, held that a party seeking modification of a consent decree can do so by showing a significant change in fact or in law. If this standard is met, it is the court's responsibility to ensure that "the proposed modification is suitably tailored to the changed circumstance." *Id.,* 502 U.S. at 383, 112 S.Ct. at 760.

The Court illuminated this standard by citing three situations in which lower courts correctly modified a consent decree: 1) "when changed factual conditions make compliance with the decree substantially more onerous"; 2) "when a decree proves to be unworkable because of unforeseen obstacles"; or 3) "when enforcement of the decree without modification would be detrimental to the public interest". *Id.,* 502 U.S. at 384, 112

S.Ct. at 760. The Court also refused to limit modification to only those situations in which unforeseen changes occurred. *Id.,* 502 U.S. at 385, 112 S.Ct. at 760–61.

I note with emphasis the Court's mandate that "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." *Id.,* 502 U.S. at 391, 112 S.Ct. at 764. Instead, once a court finds that modification is required, it should focus solely on whether the proposed modification best suits the change in circumstances. *Id.,* The Court's reasoning is critical to this case: "A court should do no more, for *a consent decree is a final judgment* that may be reopened only to the extent that equity requires" (emphasis added). *Id.,* 502 U.S. at 392, 112 S.Ct. at 764.

The Court then added:

*Within these constraints,* the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to local government administrators, who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification.

*Id.,* 502 U.S. at 392, 112 S.Ct. at 764 (emphasis added and citations omitted). Thus the *Rufo* decision represents a determination by the Supreme Court how to weigh the vested rights of inmates seeking enforcement of consent decrees in institutional reform settings against the public's right of local control over their institutions without the unnecessary supervision of the federal judiciary.

Through the PLRA, Congress has in effect declared that that determination does not act swiftly and decisively enough in one specific area of institutional reform. The PLRA completely re-writes the standard for modification in prison litigation, making consent decrees subject to the constitutional floor—in direct contrast to *Rufo.* As I will discuss more fully below, the PLRA's requirement that a court make new findings for a consent decree, already ordered, represents an unjustifiable encroachment of the legislative and executive branches into the domain of the judiciary. For these reasons, I find

§§ 3626(b) and (c) of the PLRA unconstitutional.

## II. THE SUPREME COURT'S TREATMENT OF CONSENT DECREES

The *Rufo* decision took consent decrees in institutional reform cases out of the confines of the strict standard for modification of consent decrees first enunciated by Justice Cardozo in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). I review the Supreme Court's treatment of consent decrees not only for a clearer understanding of what the law is, but also for a better understanding of the unique, and changing, nature of consent decrees.

### A. The Grievous Wrong Test

In *Swift*, the leading meatpackers in the nation were charged by the government of violating the Sherman Anti–Trust Act. These charges were resolved by a consent decree which stipulated that it shall not "be considered as an adjudication that the defendants, or any of them, have in fact violated any law of the United States." *Id.*, 286 U.S. at 111, 52 S.Ct. at 461. In exchange, the decree enjoined the meatpackers from participating in a number of transactions that would have the effect of restraining trade and commerce. In 1930, the defendants filed a petition to modify the consent decree, claiming the conditions that justified entering the decree in 1920 had become "useless and oppressive." *Id.*, 286 U.S. at 113, 52 S.Ct. at 462.

The Court recognized that even if the consent decree did not retain the power to modify itself by its terms, a court would still possess the power to adapt the decree under the inherent powers of its chancery jurisdiction. *Id.*, 286 U.S. at 114, 52 S.Ct. at 462. In making this determination, the Court explicitly rejected the view that a consent decree "is to be treated as a contract and not as a judicial act." *Id.*, 286 U.S. at 115, 52 S.Ct. at 462.

Most important in this case is the standard the Court adopted for modifying a consent decree. The Court first limited the scope of the inquiry:

We are not at liberty to reverse under the guise of readjusting.... The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow.

*Id.*, 286 U.S. at 119, 52 S.Ct. at 464. The Court then stated that the decree should not be changed absent a "clear showing of grievous wrong." *Id.* This was a burden the defendants could not meet. Over the next six decades, the grievous wrong test proved to be a formidable obstacle to modifying consent decrees in cases where a change in circumstances may have warranted it.

### B. The Consent Decree's Statutory Basis

In two such cases, the Supreme Court circumvented the grievous wrong test by emphasizing the statutory basis underlying the consent decree and adhering to that. In *System Federation No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), a consent decree was entered into as a result of a pattern of discrimination by the defendant railroad and labor union against non-union employees. At the time, the Railway Labor Act prohibited union shops. The decree, entered in 1945, settled the claims of 28 non-union employees by releasing the railroad and union from all claims of discrimination against them in consideration of a $5,000 payment to each plaintiff and an injunction against further discrimination. Six years later the Railway Labor Act was amended to permit union shops, and the union moved to modify the consent decree under Fed. R.Civ.P. 60(b).

Avoiding the grievous wrong test, the Court ruled that a court's power to adopt a consent decree does not stem from the consideration exchanged between the parties, but from the statute the decree was designed to enforce. Thus the parties in this case were only incidental to enforcement of the Railway Labor Act, and the court "must be free to continue to further the objectives of that Act when its provisions are amended." *Id.*, 364 U.S. at 651, 81 S.Ct. at 373. The Court concluded:

The parties could not become the conscience of the equity court and decide for it

once and for all what was equitable and what was not, because the court was not acting to enforce a promise but to enforce a statute. *Id.,* 364 U.S. at 652–653, 81 S.Ct. at 373. The consent decree was therefore modified, not because a grievous wrong had been shown, but because adherence to the underlying law required it.

This approach was revisited in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). There a class action was certified charging that the Memphis, Tennessee Fire Department and certain city officials were engaged in a pattern of discrimination in hiring and promotion decisions on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. A consent decree was entered into in 1980 in which the City denied violating any laws, rules, or regulations, as the plaintiffs charged. The consent decree also made provisions for the hiring and promotion of more blacks in the fire department; it did not contain any provisions regarding layoffs or reductions in rank.

One year after the consent decree was signed, city budget deficits required layoffs of employees, and the most recently hired employees were laid off first—a method which had the effect of vitiating the progress in hiring and promoting blacks made under the consent decree. The district court therefore granted an injunction blocking layoffs that would have a racially discriminatory effect. The U.S. Court of Appeals for the Sixth Circuit affirmed, phrasing the issue not as one of a preliminary injunction, but as a modification of the consent decree. 679 F.2d 541, 551 (6th Cir.1982).

The Supreme Court, in reversing the lower courts, held that modification of the consent decree in this manner would be in violation of Title VII absent a finding that the seniority system was established with discriminatory intent or a finding that the modification was necessary to make whole a victim of discrimination. *Id.,* 467 U.S. at 561 n. 9, 104 S.Ct. at 2586 n. 9. In strictly adhering to the law that gave rise to the consent decree, the Court avoided the change in circumstances that may have warranted modification, but clearly did not constitute a grievous wrong.

### C. *The Contractual Nature of Consent Decrees*

In *Local Number 93, International Association of Firefighters, AFL–CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), the Court elaborated on the consent decree's contractual undertakings of the parties' intentions. In that case, a consent decree settling discrimination claims was entered between the City of Cleveland and a group of Hispanic and Black firefighters over the objection of the firefighters' union. The Supreme Court ruled that a district court could issue a consent decree even if it might not have been able to do so after trial under applicable provisions of Title VII of the Civil Rights Act of 1964. In doing so, it discussed the "hybrid nature" of consent decrees and rejected the union's position that a consent decree was an order contemplated by the Civil Rights Act. It stated:

> [C]onsent decrees "have attributes both of contracts and of judicial decrees," a dual character that has resulted in different treatment for different purposes.... The question is not whether we can label a consent decree as a "contract" or a "judgment," for we can do both.

*Id.,* 478 U.S. at 519, 106 S.Ct. at 3073, *quoting United States v. ITT Continental Baking Co.,* 420 U.S. 223, 235–237 and n. 10, 95 S.Ct. 926, 934 and n. 10, 43 L.Ed.2d 148 (1975).

Thus consent decrees evolved from not being contractual in nature in *Swift* to being recognized as contractual in *ITT*. A change in circumstances allowed for modification by adherence to the underlying statute in *Local 93*, but not in *Stotts*. Throughout this evolution, the *Swift* grievous wrong test remained intact—and imposing.

In *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the Court held that the grievous wrong test did not apply in school desegregation cases. Although this case involved a desegregation decree, and not a consent decree, the Court,

in an opinion written by Chief Justice Rehnquist, required only that the school district show that it was acting in compliance with the Fourteenth Amendment and that it was unlikely to return to its policies of segregation. It reasoned:

> Considerations based on the allocation of powers within our federal system, we think, support our view that quoted language from *Swift* does not provide the proper standard to apply to injunctions entered in school desegregation cases. Such decrees, unlike the one in *Swift*, are not intended to operate in perpetuity. Local control over the education of children allows citizens to participate in decision-making, and allows innovation so that school programs can fit local needs.

*Id.*, 498 U.S. at 248, 111 S.Ct. at 637. The lingering question of how to reconcile the pull between the need to give lasting effect to consent decrees and the constitutional requirement to return power over local institutions to the local government was resolved by the Court one year later in *Rufo v. Inmates of Suffolk County Jail, supra.*

**D.** *Rufo's Resolution of Competing Interests*

In *Rufo,* the Supreme Court explained that consent decrees were not intended to act as a herculean hurdle in the way of local governments trying to maintain control of their institutions. The Court in *Swift*, noted the Court in *Rufo,* observed the different situations giving rise to a consent decree:

> The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.... The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

*Rufo,* 502 U.S. at 379–380, 112 S.Ct. at 758, *quoting Swift*, 286 U.S. at 114–115, 52 S.Ct. at 462–463.

The ability of a court to allow room for a decree to meet changing circumstances has assumed a more pressing need through the years. As the Court explained in *Rufo:*

> The upsurge in institutional reform litigation since *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased. The experience of the District Courts of Appeals in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation.... The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."

*Rufo,* 502 U.S. at 380–381, 112 S.Ct. at 758–759 (citations omitted), *quoting Heath v. DeCourcy,* 888 F.2d 1105, 1109 (6th Cir.1989).

Accordingly, the Supreme Court has resolved the conflict between the public and private rights involved in public reform litigation. The public's right in maintaining control over its institutions is protected through modification of a consent decree when a change in circumstances so requires. The parties' right to rely on a court order is protected by the limitation precluding a court, or Congress, from stripping a consent decree down to the constitutional floor.

## III. REQUIREMENTS AND EFFECT OF THE PLRA

In spite of the clear requirements laid down by the Supreme Court in *Rufo* for modification of a consent decree as circumstances compel, the role of the federal judiciary in prison litigation cases was sought to be completely revised through the PLRA. To what extent a court's jurisdiction has been changed by the PLRA is a source of conten-

tion between the defendants and the intervenor United States.

### A. *The Different Interpretations of Defendants and Intervenor*

Defendants contend that § 3626(b)(3) of the PLRA does not even apply in the present situation. According to defendants, when a decree has been entered without the findings required by § 3626(b)(2), the court's inquiry need go no further; termination is required at that point.[6]

Intervenor states in its brief that this interpretation raises "a serious constitutional question." To avoid the constitutional issues, intervenor argues that the finding of a current or ongoing violation a Federal right under the PLRA "encompasses not only unlawful conduct that is actually in progress at the very moment the court rules, but also failure to remedy the proximate effects of past unlawful acts." (Intervenor's Brief at 16.) It contends that a consent decree can continue if a constitutional violation has not been fully remedied or that the defendant is poised to resume the unconstitutional conduct. Thus intervenor's position is that the PLRA does not require new findings to be made regarding settled orders as much as it requires a court to tailor the decree to satisfy the PLRA standards.

The problem with intervenor's position is that some finding of past unlawful acts is still required—a finding that consent decrees were designed to avoid:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

Even under intervenor's less stringent reading of the Act, I am still required to open a final judgment to make findings that both parties agreed was in their best interest to circumvent. This fact is not changed by intervenor's position that "the record may include supplemental information that is presented to the court" when additional evidence is necessary (Intervenor's Brief at 14 n. 5), for I would still need to make findings of unlawful conduct. The "careful negotiation" that has gone into this decree; the parties' strategy to save "time, expense, and inevitable risk of litigation"; the compromises made in exchange for giving up a risk; and the resulting decree embodying each party's bargaining power are all made futile by a

---

**6.** Their interpretation is consistent with the legislative intent as expressed by one of the Act's co-sponsors, in presenting the Bill to the Senate:

The legislation I am introducing today will return sanity and State control to our prison systems. It will do so by limiting judicial remedies in prison cases and by limiting frivolous prisoner litigation.

First, we must curtail interference by the Federal courts themselves in the orderly administration of our prisons. This is not to say that we will have no court relief available for prisoner suits, only that we will try to retain it for cases where it is needed while curtailing its destructive use.

. . . .

No longer will prison administration be turned over to Federal judges for the slightest reason.

Instead, the States will be able to run prisons as they see fit unless there is a constitutional violation, in which case a narrowly tailored order to correct the violation my be entered.

. . . .

No longer, then, will we have consent decrees, such as those in Michigan under which judges control the prisons literally for decades.

141 Cong.Rec.S. 14316–17 (daily ed. Sept. 26, 1995) (statement of Sen. Abraham).

requirement to make these findings. Thus the PLRA cuts a swath through the judicial process. Under the analysis of either intervenors or defendants, I am still required by the PLRA to reopen this judgment to make findings that are antithetical to it.

## B. *The Effect of Prospective Relief*

This fact is not changed by the Act's references to "prospective relief." The Act. defines prospective relief as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). The enabling provision stipulates that § 3626 "shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." Prison Litigation Reform Act, Pub.L. No. 104–134, 1996 U.S.C.C.A.N. (§ 802(b)(1)) 178.

The Act's use of the term "prospective relief" masks the real issue. Injunctive relief affects conditions as they arise. Past injunctive relief cannot be changed as time cannot be turned back. The issue then is this: can injunctive relief based on past negotiations, cost assessments, and compromises between parties be overturned by an act of Congress?

■ I conclude that it is not prospective relief that is being altered, but the consent judgment itself. A court possesses the power to modify a consent decree to fit a substantial change in fact or in law. *Rufo, supra.* Extending modification of a decree by a court to the virtual termination of an entire group of decrees by Congress exceeds the limits of congressional authority.

There is no question but that Congress possesses the right to determine the jurisdiction of the lower courts. U.S. Const. Art. III, § 1. Whether it can preclude district courts from ever exercising jurisdiction in a particular area, such as prison litigation, is a highly debated topic (*see,* for example, Henry M. Hart, Jr., *Dialogue,* 66 Harvard Law Review 1362 (1953)), but that is not the issue here. Through the PLRA, Congress is attempting to rescind a consent decree entered in this court eleven years ago. This, Congress cannot do.

## IV. *THE PLRA'S VIOLATION OF THE SEPARATION OF POWERS DOCTRINE*

### A. *Plaut's Application to this Case*

■ Sections 3626(b)(2) and (3) represent an unconstitutional intrusion by Congress into the domain of the judiciary. "A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, ——, 115 S.Ct. 1447, 1455, 131 L.Ed.2d 328 (1995), *quoting* The Federalist No. 81, p. 545 (J. Cooke ed. 1961). Ruling on a similar action by Congress last year, the Supreme Court concluded that "[b]y retroactively commanding the federal courts to reopen final judgments, Congress has violated [the] fundamental principle" that Congress cannot reverse a court's decision. *Plaut,* 514 U.S. at ——, 115 S.Ct. at 1453.

The Supreme Court in *Plaut* was confronted with legislation which circumscribed the Court's previous decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). In that case, the Court held that particular types of securities suits were subject to a three-year statute of limitation after the violation and a one-year statute of limitation after discovery of the violation. Subsequent to the Supreme Court's decision, Congress amended the statute in question to allow suits that would not have been time-barred before the decision in *Lampf.* The law, then, opened for adjudication suits which were effectively closed by the decision in *Lampf.* The Supreme Court held Congress' action unconstitutional, stating:

> Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case of controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.

*Plaut,* 514 U.S. at ——, 115 S.Ct. at 1457. Similarly, the PLRA applies law to the con-

sent decree at issue here that was clearly not the law when it was entered into.

The *Plaut* decision issued a clarion call that the separation of powers doctrine must be strictly adhered to: The doctrine "is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.,* 514 U.S. at ——, 115 S.Ct. at 1447.

Despite this strong language, the Court twice intimated that its decision may not apply to prospective relief, thereby raising a question whether the rationale of *Plaut* extends to consent decrees such as the one at issue here. First, in response to the dissent's assertion that statutes do exist that retroactively open final judgments as an "ordinary product of the exercise of legislative power," the Court defended its interpretation of the statute cited by dissent as "consistent with the only case the dissent cites, which involved a court-ordered consent decree not yet fully executed. *Counsel v. Dow,* 849 F.2d 731, 734, 738–739 (2d Cir.1988)." *Id.,* 514 U.S. at ——, 115 S.Ct. at 1461. This language could be construed as authorizing legislative action over consent decrees whose injunctive effect is ongoing.

However, the scope of §§ 3626(b)(2) and (3) extends too far to fit into the narrow exception that could be inferred from *Plaut.* The Court in *Plaut* noted that the statutes involved in *Dow* did not necessitate adjudication of previously settled claims. *Dow* involved a curative statute which allowed for the award of attorney fees in suits for handicapped children after the Court held in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), that such fees were not available from the underlying statute. The Court in *Plaut* observed that the amendment allowing fees "says nothing about reopening final judgments, and the retroactivity provision may well mean nothing more than that it applied not merely to new suits commenced after the date of its enactment, but also to *previously* filed (but not yet terminated) suits", of which *Dow* is an example. *Plaut,* 514 U.S. at ——, 115 S.Ct. at 1461.

The second point in *Plaut* which raised a question regarding its application to consent decrees was the Court's declaration that "Congress could undoubtedly enact *prospective* legislation permitting, or indeed requiring, this Court to make equitable exceptions to an otherwise applicable rule of finality, just as district courts do pursuant to Rule 60(b)." *Id.,* 514 U.S. at ——, 115 S.Ct. at 1462. The provisions of the PLRA at issue here are indisputably retroactive in application. I therefore find that the rationale of *Plaut* applies to the separation of powers issues raised by § 3626(b)(2) and (3) of the PLRA.

## B. *The Meaning of Finality*

By distinguishing different types of finality, defendants and intervenors hope to break the link between *Plaut's* holding that final judgments cannot be reopened by Congress and *Rufo's* holding that a consent decree is a final judgment. According to this argument, the jurisprudence developed regarding consent decrees, as epitomized in *Rufo,* involves a court's inherent power, which can be overridden by Congress, as opposed to its constitutional power, which cannot, as shown in *Plaut.* The accuracy of this distinction is vital to resolving the clash between *Rufo's* mandate that a consent decree not be pared down to the constitutional floor and the PLRA's requirement that it be so.

In *Carlisle v. United States,* —— U.S. ——, 116 S.Ct. 1460, 134 L.Ed.2d 613. (1996), the Court refused to allow a district judge, under the inherent powers of the court, to grant a motion filed one day late under the Federal Rule of Criminal Procedure 29(c). Similarly, the Court ruled in *Degen v. United States,* —— U.S. ——, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), that a district court could not use its inherent powers to apply to a doctrine that had been developed and applied in criminal cases to a civil forfeiture case. Both these cases, then, involve the question of a district court judge's power to act without the authorization of a statute or the Supreme Court. In these situations, the Supreme Court has clearly limited a district court's exercise of its inherent power.

Just as clearly, that is not the situation here. I apply the law here regarding the power of a district court to modify its orders as it has been developed over the course of two centuries and crystallized in *Rufo*. My decision is not grounded on inherent authority but on constitutional authority. *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803).

Nor can it be said that the law regarding the modification of consent decrees, as developed by the Supreme Court, merely expresses a court's inherent power and is therefore subject to congressional override. Nothing could be more important to the exercise of a court's Article III power than the power to enforce a decision. To the extent that this power can be characterized as inherent, it is indispensably inherent. "Certain implied powers must necessarily result to our courts of justice, from the nature of their institution.... To fine for contempt, imprison for contumacy, *enforce the observance of order, & c., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others ....*" *United States v. Hudson,* 7 Cranch (11 U.S.) 32, 34, 3 L.Ed. 259 (1812) (emphasis added). In abrogating a court's power to enforce one of its orders, Congress has invaded one of the most vital constitutional powers of the judiciary.

## C. *Principles Behind The Separation of Powers Doctrine*

Consent decrees have been used by government agencies and private entities as the most expeditious route to resolution on a variety of issues, including the improvement of special education programs, the desegregation of schools systems, the cleanup of toxic wastes, the reformulation of exclusionary zoning lines, and the betterment of mental health institutions. Vitiating the finality of consent decrees in the area of prison reform makes the consent decrees in all other areas equally subject to congressional judgment, thus chilling a party's incentive to enter into one. Reform in these areas would consequently be impeded.

This danger was contemplated by the framers of the Constitution in warning that the accumulation of power in any one branch "may justly be pronounced the very definition of tyranny." The Federalist No. 47, 301 (C. Rossiter ed. 1961).

> Not favoritism, nor even corruption, but *power* is the object of the separation-of-powers prohibition. The prohibition is violated when an individual final judgment is legislatively rescinded for even the *very best* of reasons, such as the legislator's genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved.

*Plaut,* 514 U.S. at ——, 115 S.Ct. at 1457.

As Justice Scalia explained in *Plaut,* the framers were attempting to prohibit exactly this form of government when it established separation of powers safeguards.

> Before and during the debates on ratification, Madison, Jefferson, and Hamilton each wrote of the factional disorders and disarray that the system of legislative equity had produced in the years before the framing; and each thought that the separation of the legislative from the judicial power in the new Constitution would cure them.

*Plaut,* 514 U.S. at ——, 115 S.Ct. at 1454. Justice Scalia reiterated James Madison's "famous description of the process by which '[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex." *Id.* quoting The Federalist No. 48, 333 (J. Cooke ed. 1961).

Similarly, Justice Brandeis pronounced seventy years ago:

> The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save people from autocracy.

*Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting).

I note the approach taken by Justice Breyer in his concurring opinion in *Plaut* that a separation of powers inquiry should focus on the principle of protecting individual liberty. *Plaut,* 514 U.S. at ——, 115 S.Ct. at 1447.[7] A review of the effects of §§ 3626(b)(2) and (3) demonstrates that individual liberty is being curtailed by its requirements. Plaintiffs originally brought this action challenging the constitutionality of their conditions of confinement. In the course of negotiation with defendants, they traded a potential finding of unconstitutionality for defendants' commitment to assure the constitutionality of their confinement. The consent decree embodying this exchange received the imprimatur of this court, and "[a] legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." *Plaut* at ——, 115 S.Ct. at 1455, *quoting* The Federalist No. 81, 545 (J. Cooke ed. 1961). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803).

Instead of working to fulfill their compliance requirements, defendants now move to terminate the decree altogether. Such a result would unjustifiably deny plaintiffs the relief to which they are entitled by the power of this court—a power that cannot be taken away by Congress. Sections 3626(b) and (c) are therefore unconstitutional, and a determination of the required findings is unnecessary.

## V. *DEFENDANTS' MOTION FOR TERMINATION UNDER RULE 60*

Two routes remain available for termination of this judgment. Defendants' may move for termination upon achieving compliance with the consent decree pursuant to its terms, or termination may be required upon a substantial change in fact or in law. Under either of these approaches, completion of the S–2 Alternative Plan is key.

Built in 1926, Jackson "is still considered to be the largest walled prison in the world with over 57½ acres inside the Central Complex." *Michigan Manual* at 452 (The Legislative Service Bureau 1995–96). Integral to the consent decree is the plan in § VIII which provides for the break-up of the prison into four autonomous units instead of one large prison.

Pursuant to § VII of the consent decree, defendants conducted a study of the organization, staffing, and administration at SPSM, provided it to plaintiffs to be returned with input, and sculpted that information into a management plan for SPSM. The management plan originally submitted eventually proved to be unsatisfactory to both defendants and plaintiffs, and I refused to approve it. Following negotiation, the plan was redeveloped and the parties stipulated to the establishment of the SPSM Decentralization Team (SDT) which consisted of three representatives of the defendants and one representative of the plaintiffs.

The SDT was given broad authority to approve changes during the further development and implementation of the plan with the reservation that, should the SDT members not achieve consensus as to such a decision, then the court monitor, counsel for both parties, and I would get involved.

Following a hearing in October 1992, I approved what has been termed the "S–2 Alternate Plan." This plan was proposed by defendants, and adopted by the court, after the SDT was unable to agree on certain aspects of the plan before them. At the hearing, defendants stated on the record and in their written submissions that the S–2 Alternate Plan was deemed acceptable by the Department of Corrections and other State officials. (Defendants' Memorandum In Support Of Motion To Set For Hearing, October 13, 1992, at 2.) The project was subsequently funded with the approval of the State Legislature and the Office of Management and Budget.

On September 20, 1996, as has been my practice in the past, I personally inspected,

---

7. *See also,* Note, Congressional Authority to Reopen Final Judgments, Harvard Law Review, November, 1995.

and was impressed by, the progress of the break-up plan's construction. Phase I of the plan is nearly complete; Phases II and III have been stayed by the United States Court of Appeals for the Sixth Circuit pending appeal of my July 5, 1996 order holding unconstitutional the automatic 30-day stay provision of the PLRA. I remain convinced that completion of the S-2 Alternate Plan is necessary for termination of this consent judgment for two reasons.

First, the S-2 Alternate Plan that defines defendants' obligations was developed by the defendants and submitted to the court as an alternative to other plans under consideration by the SDT and plaintiffs. Plans generated by defendants are inferentially the least intrusive alternative as well as being least likely to contain unworkable elements. Furthermore, the plan provides that the SDT function by consensus. Since no dispute within the SDT has been raised before this court since approval of the S-2 Alternate Plan, I conclude from the record that defendants have not had objections to the way that implementation has proceeded.

Second, the S-2 Alternate Plan was formulated to correct structural deficiencies in venting, plumbing, hygienic and heating conditions that may rise to the level of constitutional violations as they currently exist. The new units are also being re-built to ensure protection of the prisoners from harm and to provide adequate space for prisoners' out-of-cell activities. The continuation of the S-2 Alternative Plan is therefore most vital to actualizing the purpose of the consent decree. When the final phases are completed, termination of this decree should be warranted both by the decree's provision for termination upon achievement of compliance with its terms and also under *Rufo*'s requirement for a substantial change in fact or in law.

## VI. *CONCLUSION*

Because it violates separation of powers principles, I hold §§ 3626(b)(2) and (3) of the Prison Litigation Reform Act unconstitutional, and therefore deny defendants' motion for termination pursuant to it. Defendants' motion for termination under Rule 60(b), on

remand before me to be reconsidered in light of the PLRA, is consequently denied as well.

**IT IS SO ORDERED.**